## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

FAHRAN ROBB,

              Plaintiff,

v.

BROOKE ROLLINS, Secretary,
United States Department of Agriculture,

              Defendant.[1]

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Case No. 21-cv-2056 (JDB/GMH)

</td></tr>
</table>

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

In this, Plaintiff Fahran Robb's second action challenging various actions taken against her by her former employer, she claims that the Department of Agriculture ("Defendant," the "Department," or the "government") terminated her employment in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and Title VII, 42 U.S.C. § 2000e *et seq.*, and challenges two decisions by an Administrative Judge of the Merit Systems Protection Board ("MSPB" or the "Board") upholding discipline imposed on Plaintiff, both of which involve allegations of whistleblower retaliation. Specifically, she alleges that the Department dismissed her because of her gender in violation of Title VII (Count I), because of her disability in violation of the Rehabilitation Act (Count II), and as retaliation for protected activity in violation of both Title VII and the Rehabilitation Act (Count III). Plaintiff also seeks review of the MSPB's May 26, 2021, decision determining that there was

---

[1] Secretary of Agriculture Brooke Rollins is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d). Because "[a]n official-capacity suit against an agency or agent of the federal government is the equivalent of a suit against the United States of America," *Davis v. Mukasey*, 669 F. Supp. 2d 45, 49 (D.D.C. 2009), the Court does not refer to the Secretary herself as the defendant in this Report and Recommendation, but rather to the government or the agency as Defendant.

sufficient cause for her termination (Count IV) and that it was not the product of whistleblower retaliation (Count V); and the MSPB's June 24, 2021, decision finding that a handful of other adverse employment actions were not retaliation for whistleblowing (Count VI).  Defendant has moved for summary judgment on all claims and, alternatively as to Count VI, dismissal for lack of jurisdiction.[2]  For the reasons that follow, Plaintiff's claims under the Rehabilitation Act (Count II and part of Count III) should be dismissed for lack of jurisdiction.  The Court should also find that it lacks jurisdiction over Plaintiff's appeal of the MSPB's June 24, 2021, decision (Count VI), which means that claim should either be dismissed without prejudice or transferred to an appropriate court under 28 U.S.C. § 1631.  Defendant's motion for summary judgment should be granted on all other claims.

## I.     JURISDICTION UNDER THE CIVIL SERVICE REFORM ACT

Conventionally, the undersigned would begin with a recitation of the facts, but because the Court clearly lacks jurisdiction over Count VI it makes sense to dispense with that claim at the outset.[3]

This case involves the Civil Service Reform Act ("CSRA"), a statute with complex rules governing the jurisdiction of various federal courts to review a decision of the MSPB, which is "an independent, quasi-judicial federal administrative agency that was established by the Civil

---

[2] The documents most relevant to this Memorandum Opinion and Order are: (1) Plaintiff's Complaint and its substantive attachments, ECF Nos. 1 and 1-1 through 1–11, 1-14; (2) Defendant's motion for summary judgment, its Statement of Material Facts, and the accompanying exhibits, ECF Nos. 41 and 41-1 through 41-4; (3) Plaintiff's opposition, its Response to Defendant's Statement of Material Facts, and the accompanying exhibits, ECF Nos. 46 and 46-1 through 46-5; and (4) Defendant's reply and accompanying exhibits, ECF Nos. 58 and 58-1.  The page numbers cited herein are those assigned by the Court's CM/ECF system, not the page numbers of the filed document.

[3] The undersigned also recommends dismissing for lack of jurisdiction Plaintiff's claim of discrimination under the Rehabilitation Act, which is Count II of the Complaint, and her claim of retaliation under the Rehabilitation Act, which is included in Count III of the Complaint.  Those issues are discussed in Section IV.A.1 and IV.B.1, *infra*.

Service Reform Act . . . to review civil service decisions."[4]  *Jones v. U.S. Dep't of Just.*, 111 F. Supp. 3d 25, 31 (D.D.C. 2015).  As the Supreme Court has explained, "The CSRA 'establishes a framework for evaluating personnel actions taken against federal employees.'"  *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (quoting *Kloeckner v. Solis,* 568 U.S. 41, 44 (2012)).  A federal employee who has suffered a "particularly serious" employment action, such as "a removal from employment or a reduction in grade or pay" may "appeal the agency's decision to the MSPB." *Kloeckner*, 568 U.S. at 44; *see also* 5 U.S.C. § 7512 (listing five types of employment actions reviewable by the MSPB).  "Such an appeal may present a civil-service claim only," such as an allegation "that 'the agency had insufficient cause for taking action under the CSRA.'"  *Perry*, 582 U.S. at 423–24 (quoting *Kloeckner*, 568 U.S. at 44).  However, it "may also or instead charge the agency with discrimination prohibited by another federal statute" like Title VII or the Rehabilitation Act.  *Kloeckner*, 568 U.S. at 44; *see also* 5 U.S.C § 7702(a)(1).  "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination, she is said (by pertinent regulation) to have brought a 'mixed case.'"  *Kloeckner*, 568 U.S. at 44 (emphasis in original) (citing 29 C.F.R. § 1614.302).

Claims challenging less serious employment actions can also be brought before the MSPB. The Whistleblower Protection Act (or "WPA") makes it "a 'prohibited personnel practice' for a government agency to take a 'personnel action' against an employee because of his disclosure of illegal activity or of 'gross mismanagement, a gross waste of funds, . . . or a substantial and specific danger to public health or safety.'"  *Weber v. United States*, 209 F.3d 756, 757–78 (D.C. Cir.

---

[4] Plaintiff objects to Defendant's characterization of the Administrative Judge's decisions here as decisions of the MSPB, asserting that "[i]t was one MSPB Judge [whose] opinion is subject to review by this Court."  *See* ECF No. 46-5, ¶ 4 & n.1.  However, the governing regulations provide that, subject to certain exceptions not relevant here, "[t]he initial decision of the judge will become the Board's final decision 35 days after issuance."  5 C.F.R. § 1201.113. The decisions are therefore properly characterized as decisions of the Merit Systems Protection Board.

2000) (alteration in original) (quoting 5 U.S.C. § 2302(b)(8)).  The CSRA "broadly defines a 'personnel action' to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020) (citing 5 U.S.C. § 2302(a)(2)(A)).  "An employee who believes he has been the victim of a prohibited personnel practice must first complain to the [U.S. Office of Special Counsel], which is required to investigate the complaint"; if that investigation does not find "reasonable grounds to believe that a prohibited personnel practice has occurred," *Weber*, 209 F.3d at 758 (quoting 5 U.S.C. § 1214), the employee may "file an appeal—known as an Individual Right of Action (IRA)—with the MSPB," *Schlottman v. Perez*, 739 F.3d 21, 23 (D.C. Cir. 2014).  A case before the MSPB alleging "both discrimination and WPA claims" is also a termed a "mixed case." *Montgomery v. Mayorkas*, Nos. 23-cv-3931, 24-cv-1697, 2024 WL 4973406, at *5 (D.D.C. Dec. 4, 2024) (quoting *Stella v. Mineta*, 284 F.3d 135, 143 (D.C. Cir. 2002)); *see also, e.g. Brown v. Ulmer*, No. 21-cv-3128, 2022 WL 226878, at *2 (D.D.C. Jan. 21, 2022) (describing a "mixed case" as "involving the WPA in combination with claims under other viable federal anti-discrimination employment statutes").

 "Section 7703 of the CSRA governs judicial review of the MSPB's decision." *Kloeckner*, 568 U.S. at 45.  The default rule is that "a petition to review a . . . final decision of the Board shall be filed in the United States Court of Appeals for the Federal Circuit." *Id.* (alteration in original) (quoting 5 U.S.C. § 7703(b)(1)).  There are two exceptions to that rule.  Pursuant to Sections 7702(a)(1) and 7703(b)(1)(B), appeals of "mixed cases shall be filed in district court." *Id.* at 50 (citing 5 U.S.C. §§ 7702(a)(1), 7703(b)(2)); *see also Perry*, 582 U.S. at 431 ("We announced a clear rule in *Kloeckner*: '[M]ixed cases shall be filed in district court.'" (alteration in original) (quoting *Kloeckner*, 568 U.S. at 50)).  Additionally, under Section 7703(b)(1)(B), "when the

4

underlying substance of the complaint involves prohibited employer conduct related to whistle-blower protections . . . , a petition for review may be filed in any court of appeals of competent jurisdiction." *Boyd v. U.S. Dep't of Veterans Affs.*, 808 F. App'x 1015, 1016 (11th Cir. 2020) (citing 5 U.S.C. § 7701(b)(1)(B)).  That is, the federal district courts have jurisdiction *only* over mixed cases, which by definition must allege "that a basis for the action was discrimination pro-hibited by [the Civil Rights Act, the Fair Labor Standards Act, the Rehabilitation Act, the Age Discrimination in Employment Act, or any rule, regulation, or policy directive prescribed under those Acts]," *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1328 (Fed. Cir. 2006) (alteration in original) (quoting 5 U.S.C. § 7702(a)(1)(B)); moreover, mixed cases *must* be brought in a district court, *see, e.g.*, *Kloeckner*, 568 U.S. at 50; *cf. Baca v. Dep't of the Army*, 983 F.3d 1131, 1138 (10th Cir. 2020) (finding that the court of appeals had jurisdiction over the plaintiff's claim because he "filed an explicit waiver of his discrimination claim" (quoting 5 C.F.R. § 1201.157 (providing that courts of appeals may review a mixed case if the employee "elects to waive the discrimination issue"))).  It follows that "[a] federal district court does not have subject matter jurisdiction over claims brought [exclusively] under the Whistleblower Protection Act."  *Montgomery*, 2024 WL 4973406, at *5; *see also Bell v. Esper*, No. 18-cv-2277, 2019 WL 6910032, at *3 (D.D.C. Dec. 19, 2019) (noting that "claims arising under" the Whistleblower Protection Act "shall be filed in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent juris-diction" and "[b]ecause this Court is not a Court of Appeals, it . . . lacks jurisdiction over a WPA claim on appeal from the MSPB" (quoting 5 U.S.C. § 7703(b)(1)(B))).  Rather, "'pure' WPA cases may only be reviewed by the courts of appeals."  *Gammill v. U.S. Dep't of Educ.*, 989 F. Supp. 2d 118, 121 (D.D.C. 2013); *see also Chinniah v. FERC*, 62 F.4th 700, 702 (2d Cir. 2023) ("'A petition to review a final order . . . of the Board' that raises a claim under only the WPA 'shall be filed in

5

the United States Court of Appeals for the Federal Circuit or any court of appeals.'" (alteration in original) (quoting 5 U.S.C. § 7703(b)(1)(B))); *Brown*, 2022 WL 226878, at *2 ("While a plaintiff may plausibly bring a 'mixed case' in this District—i.e., involving the WPA in combination with claims under other viable federal anti-discrimination employment statutes—plaintiff has filed a 'pure' WPA case, therefore depriving this court of jurisdiction."); *cf. Baca*, 983 F.3d at 1137–38. The Federal Circuit has explained that "IRA appeals are never 'mixed cases'" because "[d]iscrimination claims may not be raised in that context"—rather IRA appeals by definition raise only whistleblower allegations. *Young v. Merit Sys. Prot. Bd.*, 961 F.3d 1323, 1327 (Fed. Cir. 2020) (citing 5 C.F.R. § 1209.2(c) ("In an individual right of action appeal, the only merits issues before the Board are . . . whether the appellant has demonstrated that whistleblowing or other protected activity was a contributing factor in one or more covered personnel actions and, if so, whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action(s) in the absence of the whistleblowing or other protected activity.")).

Plaintiff filed two separate complaints with the MSPB. The first, filed on April 1, 2020, alleged that she engaged in numerous whistleblower activities, including disclosure to management that "alcohol was being illegally brought into the workplace," that her mail was being tampered with in violation of federal law, and that a "propose[d] performance standard[]" imposed by management was "illegal on its face." ECF No. 1-1 at 17–18. She maintained that numerous adverse actions—a letter of reprimand, a workstation reassignment, a five-day suspension, a limit on her communications with Department personnel, a letter of caution, a proposed fourteen-day suspension, a revocation of her telework agreement and suspension of her ID badge, and a placement on indefinite excused leave—were reprisals for her whistleblowing activity. *See id.* at 11–14, 18–19. That case was ultimately identified as MSPB Docket No. DC-1221-20-0511-W-2, and

Defendant refers to it as the "W-2 Whistleblower Case." ECF No. 41-1 at 3; *see also* ECF No. 41-4 at 2. The second, filed on July 2, 2020, alleged that her termination was "generally unfair" because it was based on procedural errors, involved concealment or falsification of evidence, and was unsupported by the facts, and that it constituted both "Whistleblower Retaliation" (based on the same disclosures alleged in the W-2 Whistleblower Case) and "Title VII and Rehabilitation Act Discrimination." ECF No. 1-7 at 23–24; ECF No. 41-1 at 3. That case was ultimately identified as MSPB Docket No. DC-0752-20-0731-I-2, and Defendant refers to it as the "I-2 Removal Case." ECF No. 41-1 at 3; *see* also ECF No. 41-3 at 2. Although the two complaints were the subject of one consolidated hearing before the Administrative Judge, they resulted in two separate decisions. *See* ECF No. 41-3 (decision on the I-2 Removal Case); ECF No. 41-4 (decision on the W-2 Whistleblower Case).

Defendant acknowledges that the "I-2 Removal Case is a mixed case as Plaintiff made claims of improper removal from federal service, an action directly appealable to the Board per 5 U.S.C. § 7512, and also claimed Title VII and Rehabilitation Act violations" as well as whistleblower reprisal. ECF No. 41-1 at 3–4. And, as explained above, only district courts have jurisdiction to review MSPB decisions in mixed cases in the first instance. However, Defendant maintains that "the W-2 Whistleblower Case is not a mixed case as it was limited to whistleblower retaliation claims." *Id.* at 4. Accordingly, it seeks dismissal for lack of jurisdiction of Count VI, the count seeking review of the decision on the W-2 Whistleblower Case.[5] *See id.* at 28.

---

[5] Defendant also argues the merits of the claim Plaintiff alleges in Count VI. *See* ECF No. 41-1 at 10–13, 27–28; ECF No. 58 at 14–16. There is no need to address those arguments because the claim should be dismissed on jurisdictional grounds, as discussed below. *See, e.g.*, *Montgomery*, 2024 WL 4973406, at *5 ("A federal district court does not have subject matter jurisdiction over claims brought [exclusively] under the Whistleblower Protection Act[.]").

Defendant's characterization of the W-2 Whistleblower Case is accurate, as should be clear from the outline of the complaint above. That is confirmed by a review of (1) the complaint form, which acknowledges that Plaintiff was "filing an IRA appeal," ECF No. 1-1 at 4; (2) the Administrative Judge's decision in the case, which identifies the case before her as "an individual right of action (IRA) appeal," describes it as "alleging that the agency had taken certain personnel actions in retaliation for protected whistleblowing disclosures," and fails to mention allegations of discrimination, ECF No. 41-4 at 2–3; and (3) Plaintiff's opposition here, which acknowledges that the case was brought under the Whistleblower Protection Act as "an IRA," ECF No. 46 at 10. Accordingly, this Court cannot resolve that appeal. More, Plaintiff has failed to address Defendant's jurisdictional argument in her opposition. *See* ECF No. 46. She should therefore be deemed to have conceded Defendant's jurisdictional argument under the principle that "'a party [who] fails to address an argument that is put forth in a dispositive motion . . . may be deemed [to have] conceded [it],' and its corollary principle that a court 'is not obliged to make argument on [a party's] behalf.'" *Robb v. Rollins*, No. 20-cv-929, 2025 WL 1025084, at *2 (D.D.C. Apr. 7, 2025) [hereinafter *Robb I*] (citations omitted) (alterations in original) (first quoting *Antoine v. U.S. Bank Nat'l Ass'n*, 821 F. Supp. 2d 1, 6 (D.D.C. 2010); and then quoting *James v. Miche Bag Corp.*, No. 11-cv-963, 2012 WL 13072049, at *2 (D.D.C. Mar. 30, 2012)).

Dismissal for lack of jurisdiction might seem like the appropriate remedy here. However, under 28 U.S.C. § 1631, a court that finds it lacks jurisdiction over an action "shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed" and the action will thereafter proceed as if it were filed in transferor court on the date it was filed in the transferee court. 28 U.S.C. § 1631. "In determining whether transfer is in the interest of justice, the equities of dismissing a claim

when it could be transferred should be carefully weighed." *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996), *as amended* (Oct. 7, 1996).  Courts in this Circuit consider factors such as whether the plaintiff who filed in the incorrect forum "in good faith[] misinterpreted a complex or novel jurisdictional provision," *Janvey v. Proskauer Rose, LLP*, 59 F. Supp. 3d 1, 7 (D.D.C. 2014), "whether the claims would be time-barred upon refiling, whether transfer would prejudice the [defendant's] position on the merits, and whether transfer would save the plaintiff the time and expense of refiling in a new district," *Does 1-144 v. Chiquita Brands Int'l, Inc.*, 285 F. Supp. 3d 228, 235 (D.D.C. 2018).  Where, as here, no party has requested a transfer, a court "*may* on its own initiative transfer a case under 28 U.S.C. § 1631"; the decision is "committed to the discretion of the District Court." *Halim v. Donovan*, 951 F. Supp. 2d 201, 204 (D.D.C. 2013) (quoting *Jovanovic v. US–Algeria Bus. Council*, 561 F. Supp. 2d 103, 112 (D.D.C. 2008)).  The D.C. Circuit has itself declined to transfer a case where the plaintiff did not seek such a remedy, *see Powell v. Dep't of Def.*, 158 F.3d 597, 600 n.3 (D.C. Cir. 1998), *abrogated on other grounds as recognized in Perry v. Raimondo*, 101 F.4th 55, 62 (D.C. Cir. 2024), and has found that a district court that refused to transfer a claim *sua sponte* did not abuse its discretion, *see Baptichon v. U.S. Dep't of Educ.*, No. 23-5081, 2024 WL 119767, at *1 (D.C. Cir. Jan. 11, 2024).  Other courts have requested briefing on the issue. *See, e.g.*, *Becker v. Merit Sys. Prot. Bd.*, No. 2023-1102, 2023 WL 3262961, at *1 (Fed. Cir. May 2, 2023) (considering its jurisdiction *sua sponte* and directing the parties to show cause why the case should not be transferred under Section 1631 in the interest of justice).

It is not clear at this point whether the interest of justice counsels in favor of transfer to an appropriate Court of Appeals.[6]  Moreover, the question of whether Section 1631 permits a court

---

[6] To be sure, Plaintiff's request to review the MSPB's decision in the W-2 Whistleblower Case would seem to be time-barred if brought now in an appropriate Court of Appeals: the Administrative Judge's decision was issued on June 24, 2021; it became the final decision of the MSPB 35 days thereafter, *see* 5 C.F.R. § 1201.113, and a petition for review was due 60 days after that, *see* 5 U.S.C. § 7703(b)(1)(B); *see Nolan v. Dep't of Energy*, No. 2023-2242,

9

to transfer individual claims, rather than an entire "action or appeal," appears to be unsettled. *Compare Shrader v. Biddinger*, 633 F.3d 1235, 1249–50 (10th Cir. 2011) ("We are aware of no authority even permitting, much less requiring, a district court to unilaterally split up an action and transfer the resultant components to diverse jurisdictions under the auspices of § 1631."), *Hill v. U.S. Air Force*, 795 F.2d 1067, 1070 (D.C. Cir. 1986) ("Because Section 1631 directs a court to transfer an 'action' over which it lacks jurisdiction, rather than an individual claim, we find the District Court did not abuse its discretion in failing *sua sponte* to transfer [the plaintiff's] claims against [his supervisor] in his personal capacity to the District Court in New Mexico."), *and ITServe All., Inc. v. Cuccinelli*, 502 F. Supp. 3d 278, 290 (D.D.C. 2020) ("The court cannot, how-ever, transfer individual claims over which it lacks jurisdiction." (citing *Hill*, 795 F.2d at 1070)),

---

2023 WL 7293884, at *1 (Fed. Cir. Nov. 6, 2023) (holding that the 60-day deadline in Section 7703(b)(1)(B) "is mandatory and jurisdictional, and thus cannot be waived or tolled"). That date—September 27, 2021—has long passed, which "militat[es] for a transfer." *Liriano*, 95 F.3d at 122. Nor does it appear that Defendant's position on the merits would be prejudiced by a transfer, as this case will be decided on the administrative record and the govern-ment has already briefed the issue, *see* ECF No. 41-1 at 27–28; ECF No. 58 at 14–16. And, as discussed in this section, the jurisdictional rules of the CSRA are complex. On the other hand, Plaintiff is represented by an attorney who holds himself out as an expert in whistleblower and MSPB cases, *see About Morris E. Fischer*, Morris Fischer Attorney at Law, https://www.morrisfischerlaw.com/ [https://perma.cc/6L3U-L5T7], and so can be assumed to know how to navigate those complexities. *See Janvey*, 59 F. Supp. 3d at 7–8 (finding the fact that the plaintiff was repre-sented by "sophisticated counsel" who sued in the wrong forum weighed against transfer). Even if Plaintiff's counsel were somehow unaware of the jurisdictional problem at the outset of this case, Defendant provided him notice in its Motion for Summary Judgment; yet counsel wholly disregarded the issue and failed to request a transfer. *See North v. Smarch, Inc.*, 160 F. Supp. 3d 63, 85 (D.D.C. 2015) (finding that a failure to request transfer weighed against transferring the case). And once the relevant statutory sections are examined, the jurisdictional question is not a close one. Those facts suggest that Plaintiff's counsel might not have "in good faith[] misinterpreted a complex . . . juris-dictional provision." *Janvey*, 59 F. Supp. 3d at 7. Finally, "[i]n exercising th[e] discretion [to transfer rather than dismiss a case], courts may take a 'peek at the merits' of the case to evaluate whether dismissal is more appropriate because the claims have 'obvious substantive problems.'" *Hooli v. Mitcham*, No. 24-cv-6, 2024 WL 4836419, at *5 (D.D.C. Nov. 20, 2024) (quoting *Laukus v. United States*, 691 F. Supp. 2d 119, 127 (D.D.C. 2010)), *appeal filed*, No. 25-7006 (D.C. Cir. Jan. 13, 2025). Plaintiff makes two cursory arguments that the Administrative Judge's decision in the W-2 Whistleblower Case should be reversed. The first—that Plaintiff's five-day suspension for failing to follow her supervisor's directions to return a personnel form was "unjustified" and that "[t]he only explanation for" the su-pervisor's inclusion of another specification related to a failure to attend a meeting as directed "is retaliation," ECF No. 46 at 12—is conclusory and undermined by the discussion of the five-day suspension in the undersigned's decision in Plaintiff's earlier case raising related issues, *see Robb I*, 2025 WL 1025084, at *17. The second, which relates to a proposed fourteen-day suspension for failure to follow instructions that was later rescinded, is similarly undeveloped and conclusory, insisting that the agency "didn't prove the legitimacy of the charge[] by clear and convincing evi-dence" as required. *See* ECF No. 46 at 12–13. More, neither argument addresses—or even acknowledges—the highly deferential standard that must be applied to review of the decision. *See* Section IV.C., *infra*. Those substantive problems may be seen to weigh against transfer.

with *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 110 (3d Cir. 2009) ("[W]e have interpreted section 1631 to permit the transfer of all or only part of an action."), *and Khalid v. Garland*, No. 21-cv-2307, 2023 WL 8600506, at *3 (D.D.C. May 25, 2023) (interpreting *Hill* as holding merely that "the district court had not abused its discretion by not transferring individual claims to another court sua sponte" and noting that "the D.C. Circuit has transferred, or directed the district court to transfer, individual claims under § 1631"). Accordingly, it would be premature to make a recommendation on this issue in the absence of further input from the parties. But delaying this Report and Recommendation until the parties submit further briefing allowing the undersigned to analyze this single issue and recommend an outcome seems inefficient, especially as the parties will have the opportunity to file objections and responses to objections under Rule 72(b). The undersigned therefore recommends they address a potential transfer under Section 1631 in any objections to this Report and Recommendation.

## II.      BACKGROUND[7]

As noted, this is Plaintiff's second action against her former employer, the Department of Agriculture, alleging that it illegally discriminated and retaliated against her. Unlike her prior action, which centered on various adverse employment actions preceding her dismissal, "[t]his case pertains mostly to her termination." ECF No. 46 at 2; *see generally Robb I,* 2025 WL 1025084 (opinion granting in part and denying in part the government's motion for summary judgment). Nonetheless, both parties here purport to "incorporate" or "rel[y]" on argument and evidence from that prior case, which was consolidated with this one exclusively for purposes of discovery.[8] *See,*

---

[7] Except where noted, the facts below are undisputed (or deemed undisputed) either because they have been admitted in Plaintiff's response to Defendant's Statement of Material Facts (Plaintiff did not file a counter-statement), because they appear in the record without contradiction from other evidence in the record, or because they appear in Defendant's Statement of Material Facts and have not been properly controverted.

[8] Incorporation by reference is disfavored; it interferes with the efficiency of the court's decision-making and complicates the record. *See, e.g.*, *Brown v. District of Columbia*, No. 17-cv-348, 2019 WL 3423208, at *7 (D.D.C. July 8,

*e.g.*, ECF No. 41-1 at 2 n.1; ECF No. 46 at 5; ECF No. 58 at 2 n.1; *see also* ECF No. 16 (granting "the parties' joint motion to consolidate for discovery purposes"). The undersigned therefore includes certain relevant background facts from *Robb I* (further details can be found in that opinion, *see* 2025 WL 1052084).

### A.    Factual Background

Plaintiff was first hired by the Department in November 2013 "as a contractor in the position of Senior Agricultural Scientific Advisor (Biofuels) in the Office of Global Analysis, Global Policy Analysis Division, Foreign Agricultural Service." *Robb I*, 2025 WL 1025084, at *3. When that contract ended, she accepted a position as an Agricultural Economist in the same office and then, in May 2016, was reassigned "to the position of International Economist in the Office of Agreements and Scientific Affairs, Plant Division, Foreign Agricultural Service." *Id.* Plaintiff contended that, beginning in August 2017, managers engaged in gender discrimination by

---

2019); *Lecinsky v. Clark Cnty. Sch. Dist.*, 539 F. Supp. 3d 1121, 1129 n.8 (D. Nev. 2021) (noting that incorporation by reference is disfavored because it fosters "a confusing presentation of arguments" among other things). That is especially true here, where both parties have failed to include as exhibits to the summary judgment briefing in *this* case evidence relevant to the claims here, citing instead such evidence attached as exhibits to the briefing on the Motion for Summary Judgment in the *prior* case, although it was largely irrelevant there. *See* ECF No. 41-2, ¶¶ 8–14, 22, 28, 53, 56–58, 61 (Defendant's Statement of Undisputed Material Facts in support of its Motion for Summary Judgment in this case citing the following exhibits to its Motion for Summary Judgment in *Robb I*: a Notice of Placement on Administrative Leave issued to Plaintiff on April 4, 2018, *see Robb I*, ECF No. 56-17; a Notice of Proposed Removal issued to plaintiff on March 18, 2020, and the file containing the materials relied in issuing the Notice of Proposed Removal, *see id.*, ECF Nos. 56-20, 56-21; testimony from the MSPB hearing on Plaintiff's claims, *see id.*, ECF No. 56-22; and a Notice of Decision issued to Plaintiff on June 2, 2020, *see id.*, ECF No. 56-23); ECF No. 46-5, ¶¶ 12, 20, 22, 64 (Plaintiff's Response to Defendant's Statement of Material Facts in this case citing the following exhibits to the summary judgment briefing in *Robb I*: the transcript of the March 3, 2021, MSPB hearing, *see* ECF No. 59-2 at 379, 532–34; a memorandum dated March 7, 2019, outlining the Anti-Harassment Policy of the Foreign Agricultural Service, *see id.* at 650–56; and a January 17, 2020, Notice of Administrative Leave directed to Plaintiff, *see id.* at 658). Indeed, failure to spell out relevant facts and arguments in a court submission by merely referring to information in other submissions in the *same* case, let alone submissions in a *different* case, can lead to forfeiture. *See Phillips v. Okla. Dep't of Corr.*, 79 F. App'x 380, 383 (10th Cir. 2003) (noting that incorporation by reference can result in forfeiture of arguments). However, the undersigned will not deem the parties' use of this unwelcome technique to have worked a forfeiture here, primarily because (1) both parties employ it, (2) the parties appear to have accurately identified the evidence from *Robb I* cited, and (3) much of that evidence, although not included in the exhibits attached to the summary judgment briefing here, is attached to Plaintiff's Complaint in this case.

removing job duties from her purview and transferring the bulk of them to a male employee.  *See id.* at *4, *12.

"In November 2017, Plaintiff began to have interpersonal issues with colleagues."  *Id.* at *5.  On November 1, 2017, co-worker Julie Chao complained about Plaintiff's behavior to Plaintiff's supervisor, who asked Chao to leave the premises while he spoke to Plaintiff.  *See id.*  According to Chao, "when she returned to the office, Plaintiff told her, 'No one likes a two-faced bitch.'"  *Id.*  Another colleague, Cheryce Howard, asserted that, about one week later, "Plaintiff approached her in an aggressive manner regarding a work issue, then 'stomped out of the office and said, "Fucking Bitch!"' which caused Howard to fear for her safety."[9]  *Id.* (quoting the record).  Those incidents spurred an investigation that, in turn, resulted in a Letter of Caution issued to Plaintiff in December 2017, and, ultimately, a Letter of Reprimand issued to Plaintiff in May 2018.  *See id.* at *5–6.  During that same period, Plaintiff alleges that she "noticed that her mail was not arriving as expected."  ECF No. 1-1 at 8.  "[B]etween January and May of 2018 and again in October 2018," she reported to management, including her supervisor Mayra Caldera, that she suspected her mail was being tampered with in violation of federal law.  ECF No. 41-3 at 45.

On November 26, 2018, Caldera issued Plaintiff a Notice of Proposed 5-Day Suspension for conduct unrelated to the incidents with Chao and Howard: the two specifications therein charged Plaintiff with (1) failing to follow Caldera's instructions to return Plaintiff's performance evaluation by a particular date and (2) failing to attend a meeting as directed by Caldera.  *Robb I*, 2025 WL 1025084, at *6.  Plaintiff alleges that, the day after she received the notice, she reported to Caldera that it did not meet the requirements of the governing collective bargaining agreement.  *See* ECF No. 1-1 at 9; *see also* ECF No. 41-3 at 46.  She further asserts that on February 21 and

---

[9] Plaintiff asserts that Chao "perjured her statement" and that Howard "was in the wrong that day."  *Robb I*, 2025 WL 1025084,  at *5 (quoting the record).

25, 2019, she engaged in whistleblowing activity by reporting the alleged violation of the collective bargaining agreement to various other Department officials, including Ken Isley, who was then the Administrator of the Foreign Agricultural Service, and Assistant Deputy Administrator Katherine Nishiura.  *See* ECF No. 1-1 at 9; *see also* ECF No. 41-3 at 46.  On February 25, 2019, Nishiura ordered the five-day suspension, sustaining the specification related to the performance evaluation because Plaintiff admitted she had not returned the form by the required date but dismissing the specification related to the meeting because Plaintiff's use of sick leave prevented her from attending it.  *See Robb I*, 2025 WL 1025084, at *6.

On February 27, 2019, Caldera issued Plaintiff a Letter of Instruction requiring Plaintiff to "cease and desist any/all communication regarding [Plaintiff's] 5 day suspension with parties not involved in the process," including Foreign Agricultural Service Administrator Isley; Ted McKinney, then the Under Secretary of Agriculture for Trade and Foreign Agricultural Affairs, a political appointee confirmed by the Senate; and Sonny Perdue, then the Secretary of Agriculture; but excepting from the prohibition "any Civil Rights Staff or Office of Special [Counsel] Staff."  ECF No. 1-5 at 97; *see also* ECF No. 41-3 at 8.  It further cautioned Plaintiff that "[m]oving forward" she must "not bypass procedure" or "involve persons outside of proper procedure" and instructed her to "use the proper channels" when asserting her "rights related to [the] suspension."  ECF No. 1-5 at 97.  The Letter of Instruction also directed Plaintiff to stop making "requests to [Office of Capacity and Building Development] management"—Plaintiff's workstation was at that time "in a location that was part of the Office of Capacity Building and Development," ECF No. 1-1 at 11, 13, apparently because of the contretemps with Chao and Howard, *see* ECF No. 41-3 at 21–22— "regarding the moving of [her] work station," ECF No. 1-5 at 97.  According to the Administrative Judge, less than one hour after Plaintiff received the Letter of Instruction, she emailed various

14

officials, including the Ombudsman of the Office of the Inspector General ("OIG"), reporting that she had seen alcohol on the agency's premises and asserting that Caldera "had brought alcohol 'illegally' into the building on multiple occasions."[10]  *See* ECF No. 41-3 at 47–48; *see also* ECF No. 1-1 at 9.  Plaintiff asserts that on March 2, 2019, she again reported alleged mail tampering—this time to the OIG Ombudsman and the ethics office for Trade and Foreign Agricultural Affairs—and charged that her five-day suspension was retaliation for her whistleblowing.  *See* ECF No. 1-1 at 10.; *see also* ECF No. 41-3 at 45–46.

Plaintiff's five-day suspension lasted from March 6, 2019, to March 10, 2019, inclusive. *See Robb I*, 2025 WL 1025084, at *6.  Not long before the beginning of that suspension, Plaintiff complained about her workspace—specifically, about the keyboard tray at her desk, which allegedly exacerbated musculoskeletal disorders stemming from a 2008 automobile accident.[11]  *Id.* at *7.  On March 11, 2019—after issuance of the Letter of Instruction and after Plaintiff returned from her five-day suspension—Plaintiff sent two emails to several Department employees.  *See* ECF No. 46-5, ¶¶ 10–11.  One stated that on Monday, March 4, "Rodney [Grimes] of Facilities inspected my desk in Room 3846-S and determined that it is his expert opinion that he cannot fix the keyboard tray on this style of desk and that he recommends that I be moved to the desk on Room 4603-S"; the other stated that "[Department] facilities recommended that [she be] moved to 4603-S"[12]  *Id.* (alterations in original) (quoting the record); *see also Robb I*, 2025 WL 1025084, at

---

[10] Plaintiff has not disputed the Administrative Judge's characterization of the timing or subject of that email.

[11] "A 'keyboard tray' is an ergonomic accessory generally mounted under a desk to hold a computer keyboard and mouse."  *Robb I*, 2025 WL 1025084, at *7 n.11.  The keyboard tray complaint in or around March 2019 was the last in a series of such complaints Plaintiff made about various keyboard trays at various workstations.  *See id.* at *7, *18–19.

[12] As discussed more fully below, the Department cited those emails—which it asserts were false—as evidence of conduct unbecoming a federal employee in support of Plaintiff's termination.  *See* ECF No. 46-5, ¶¶ 10–12.

*7 n.15.  In an email response that same day, Grimes asserted that he had made no such recommendation, as did his supervisor Thomas Davis.  *See* ECF No. 1-5 at 64–65.  Also, that same day, Caldera proposed to suspend Plaintiff for fourteen days for misconduct, a proposal that was withdrawn on March 18, 2019.  ECF No. 41-4 at 25–26.[13]

Plaintiff alleges that she engaged in whistleblowing activity again when she reported to Caldera on March 15, 2019, and to Caldera's boss Mark Rasmussen on March 18, 2019, that the "performance standards and elements" Caldera proposed for Plaintiff were "illegal on [their] face." ECF No. 1-1 at 10 (alteration in original); *see also* ECF No. 1-5 at 37.

On April 2, 2019, Plaintiff's security clearance was suspended.[14]  *See* ECF No. 1-5 at 16. On April 4, Caldera issued Plaintiff a Notice of Placement on Administrative Leave due to that suspension.[15]  *See id.*  The Notice prohibited Plaintiff from reporting to her duty station, accessing any Department buildings or buildings occupied by Department personnel, or performing any official duties without authorization from management.  *See id.*  She was further instructed not to access any computers or computer systems, email programs, or employee websites or to "contact any employees of the Agency or Department with regard to any work matters, unless specifically

---

[13] Neither that proposal nor its withdrawal is in the record in this case or in *Robb I*.  However, they are mentioned in the Administrative Judge's decision in the W-2 Whistleblower Case, *see* ECF No. 41-4 at 25–26, in Defendant's opening brief, *see* ECF No. 41-1 at 12, and in Plaintiff's Opposition, *see* ECF No. 46 at 11.

[14] It is not clear from the record why Plaintiff's security clearance was suspended.  An email from an official at the Department's Office of Homeland Security asserts that it was suspended "[b]ased on information provided . . . by [her] agency."  ECF No. 1-5 at 56.  According to Plaintiff's complaint in the W-2 Whistleblower Case, in the letter informing her of the suspension, "[t]he basis for the suspension was specifically identified as including 'unwillingness to comply with rules and regulations[.]'"  ECF No. 1-1 at 19 (second alteration in original).

[15] That Notice is erroneously dated April 4, 20*18*, but it must have been issued on April 4, 20*19*, because it refers to the April 2, 2019, suspension of Plaintiff's security clearance.  *See* ECF No. 1-5 at 16.

authorized to do so" in the Notice of Placement on Administrative Leave. *Id.* The Notice listed as "Exceptions: EEO, EAP, Union Officials/Reps, or NFC, EPP as appropriate."[16] *Id.*

In the ensuing months, Plaintiff sent a number of emails including Isley and/or McKinney as addressees that became support for Plaintiff's ultimate termination.[17] On April 29, 2019, she sent an email with the subject line "Re: security clearance suspension" to Isley and McKinney, as well as to Chief of the Personnel Security Branch Carlena Fitzhugh, who had informed Plaintiff that the suspension of her security clearance was unrelated to her protected EEO activity (as discussed more fully below, Plaintiff had filed a formal EEO complaint in March 2018); Chief of the Personnel and Document Security Division Brodrick Wilcox; his employee Christina Mitchell; the OIG Ombudsman; and "SM.OASCR.DCWA3," which appears to be an address related to the Department's Office of the Assistant Secretary for Civil Rights. *See* ECF No. 41-3 at 12, 19–20. The email challenged Fitzhugh's assertion that the suspension of Plaintiff's security clearance was unrelated to her EEO complaint, asked that the suspension be lifted and that she be reassigned, and "note[d] to the Civil Rights office that her email should be considered as an 'informal EEO complaint.'" *Id.* at 20.

On July 11, 2019, Plaintiff sent an email to Isley and McKinney as well as Fitzhugh; Wilcox; Mitchell; the OIG Ombudsman; "SM.OASCR.DCWA3"; head of the Office of Process,

---

[16] "EAP" is the Employee Assistance Program. *See* ECF No. 41-3 at 6 n.5. "NFC, EPP" is the National Finance Center Employee Personal Page. *See id.* The National Finance Center provides payroll, personnel, and insurance services for the Department. Nat. Fin. Ctr. U.S. Dep't of Agric., NFC Overview 3, https://nfc.usda.gov/Publications/HR_Payroll/Brochures/NFC_Overview_Brochure.pdf [https://perma.cc/UQA9-3KMT]. The Employee Personal Page "is a Web-based application that provides employees self-service access to their personal information." EPP (Employee Personal Page), Nat. Fin. Ctr. U.S. Dep't of Agric. (last updated Dec. 20, 2023), https://help.nfc.usda.gov/systems/EPP/index.php [https://perma.cc/B973-FJT3].

[17] Most of the emails that are at issue here appear in the record with significant redactions. *See* ECF No. 1-5 at 24–67. However, the Administrative Judge reviewed unredacted versions and she describes those emails in detail in her decision in the I-2 Removal Case, which is under review here. *See* ECF No. 41-3 at 8, 11–20. As Plaintiff has not suggested that the descriptions are inaccurate, the undersigned uses them here.

Product, and Trade Regulations in the Office of Agreements and Scientific Affairs Karina Ramos; and Deputy Assistant Secretary of Civil Rights Naomi Earp. *Id.* at 13, 16–18. The email concerned proposed new performance standards for a different employee, which Plaintiff alleged were unlawful; claimed that the employee had suffered from discrimination and retaliation; asked for rescission of all performance improvement plans for non-supervisory employees of the Foreign Agricultural Service; asserted other employees had been discriminated against; claimed that an attorney in the Employee Law and Hearings Branch had violated ethical standards and Department policies; and charged other named employees in Human Resources with violating Department policies. *Id.* at 17. Plaintiff indicates that this email included a complaint that Ramos had engaged in harassment. *See* ECF No. 46 at 6.

On August 12, 2019, Plaintiff sent an email to Isley and McKinney as well as Fitzhugh, Wilcox, Mitchell, Earp, the OIG Ombudsman, and "SM.OASCR.DCWA3." *See* ECF No. 41-3 at 18. The email "complained that [Plaintiff] had not received a response" to her July 11, 2019, email and alleged that an agency attorney had committed ethical violations. *Id.*

On September 3, 2019, Plaintiff sent an email to Isley and McKinney as well as Fitzhugh, Wilcox, Mitchell, the OIG Ombudsman, "SM.OASCR.DCWA3," and Earp. *Id.* at 15. That email was "primarily directed" at Isley and again concerned the performance standards for the employee who was the subject of the July 9 email. *See id.* It indicated that Isley had not responded to the earlier email, expressed Plaintiff's belief that the performance improvement plan was illegal and harassing, and claimed that another employee had behaved disrespectfully and unprofessionally. *See id.*

On September 30, 2019, Plaintiff sent an email to Isley and McKinney as well as Fitzhugh; Wilcox; Mitchell; Earp; Director of the Office of Civil Rights Adriano Vasquez; Animal Health

Inspection Service employee Pamela Washington; Kim Cash, the Director of the division that oversees personnel misconduct investigations; and "APHIS-EMSSD," an address which sent the email to "all employees in the USDA Emergency Management, Safety and Security Division (EMSSD) in the Animal and Plant Health Inspection Service (APHIS)." *Id.* at 11–12. The email alleged evidence tampering in connection with the investigation of Plaintiff's "conduct toward another employee" (presumably the investigation into the incidents involving Chao and/or Howard), alleged that three other female employees had suffered unlawful conduct and retaliation, and asserted that the email was sent pursuant to the EEO exception in the April 4 Administrative Leave Notice. *Id.* at 11.

On October 1, 2019, Plaintiff sent an email to Isley as well as Fitzhugh, Wilcox, Mitchell, and Catherine Fulton, Caldera's replacement as Plaintiff's supervisor. *See id.* at 13. The email "provided her new supervisor with her contact information, sought her signature on a reimbursement form regarding a fitness membership, and addressed the packing of her personal belongings." *Id.* It also "addressed [Plaintiff's] prior downgrade,[18] asked about a potential lunch with an agency employee, sought direction regarding her involvement in the Future Farmers of America . . . , and requested assistance in returning to work." *Id.* at 13–14.

On November 4, 2019, Caldera issued Plaintiff a Notice of Proposed Removal including charges of failure to follow instructions based on the six emails just described and of conduct unbecoming a federal employee based on Plaintiff's allegedly unfounded statements that Grimes recommended changing Plaintiff's workstation and that Caldera had brought alcohol onto the

---

[18] It is not clear from the decision what is meant by Plaintiff's "prior downgrade," but it could refer to the fact that, when Plaintiff began as a contract worker at the Department, she occupied a higher level in the government's classification and pay system than she did when she later accepted a job with the Department, after the contract she had been working under was terminated. *See Robb I*, 2025 WL 1025084, at *3.

premises in contravention of Department rules.[19]  *See* ECF No. 1-3 at 1, 5–6.  That Notice was eventually rescinded.  *See* ECF No. 1, ¶ 47; ECF No. 41-1 at 13.

On January 17, 2020, Caldera reissued Plaintiff a Notice of Administrative Leave.  *See* ECF No. 1-5 at 21.  The Notice was "reissued to provide clarification about the communication restrictions with USDA employees that were detailed in the February 27, 2019[,] Letter of Instruction and [the] April 4, 2019[,] Notice of Placement on Administrative Leave."  *Id.*  The language of the prohibitions largely tracks that used in the prior Notice of Placement on Administrative Leave, including the prohibition on "contact[ing] any employees of the Agency or Department with regard to any work matters unless specifically authorized to do so."  *Id.*  The exception was worded slightly differently, however.  Instead of listing "Exceptions: EEO, EAP, Union Officials/Reps, or NFC, EPP as appropriate," *id.* at 16, it read, "[t]his contact restriction includes an exception where you may contact Agency employees who have direct involvement with the following matters: **EEO (Equal Employment Opportunity), EAP (Employee Assistance Program), or NFC (National Finance Center) EPP (Employee Personal Page)**," *id.* at 21 (emphasis in original).

A Notice of Proposed Removal was issued on March 18, 2020.  *See id.* at 1–10.  It included two charges: Charge 1 for failure to follow instructions and Charge 2 for conduct unbecoming a federal employee.  *See id.* at 1, 4.  Charge 1 had six specifications, one for each of the emails described above, which allegedly violated the April 4, 2019, Notice of Placement on Administrative Leave because they were sent to officials outside the "limited exception[s]" for personnel involved in Equal Employment Opportunity or the Employee Assistance Plan, union officials or representatives, and the National Finance Center and its Employee Personal Page.  *Id.* at 1–4.

---

[19] The specifications in the second Notice of Proposed Removal issued on March 18, 2020, which is discussed in detail below, contained the same specifications except for the one related to alcohol on the premises.

Charge 2 had two specifications. *See id.* at 4.  One alleged that Plaintiff demonstrated conduct unbecoming a federal employee when she sent her March 11, 2019, email asserting that "USDA facilities recommended that [she] be moved to office location 4603-S" because the assertion was "unsubstantiated" and "unfounded" and sent to employees (such as Isley and Assistant Deputy Administrator Charles Bertsch) with "no direct involvement in [the] matter," thus causing unnecessary disruption and undermining the Department's mission. *Id.*  The other specification alleged that she demonstrated unbecoming conduct when she sent her March 11, 2019, email stating that Rodney Grimes had recommended she be moved to a desk in Room 4603-S, for the same reasons: the statement, which was found to be "groundless," was sent to employees like Isley and Bertsch who were not involved in assigning work locations and caused unnecessary disruption. *Id.* at 4–5.

On June 2, 2020, Laura K. Anderson, Senior Director of the Animal Division in the Office of Trade Policy and Geographic Affairs of the Foreign Agricultural Service, found a preponderance of the evidence supported all charges and specifications and that Plaintiff should be dismissed from federal service effective immediately. *See* Ex. U to Mot. for Summary J. 3, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23; *see also* ECF No. 1-14.

**B.    Procedural History**

1.    Plaintiff's EEO Complaint

Plaintiff filed a formal EEO complaint in March 2018 and amended it numerous times. *See Robb I*, 2025 WL 1025084, at *8.  The allegations accepted by the Department for decision included, among other things, whether management subjected Plaintiff to discrimination and retaliation when it removed portions of her duties beginning in August 2017, commenced a misconduct investigation in November 2017, issued the December 2017 Letter of Caution, issued the May

2018 Letter of Reprimand, and failed to provide her an ergonomic workstation. *See id.* The final agency decision rejecting Plaintiff's claims was issued in January 2020. *See id.*

Plaintiff then sued the Department in federal court in *Robb I*, Case No. 20-cv-929. *See id.* Ultimately, she argued that Defendant discriminated against her based on her gender when it reduced her job duties, retaliated against her for protected activity when it imposed the five-day suspension, and failed to reasonably accommodate her disability in connection with her various complaints about her workstations. *See id.* at *2. In that case, in April 2025, the undersigned granted in large part Defendant's motion for summary judgment, leaving only a failure to accommodate claim related to Plaintiff's March 2019 complaint about her keyboard tray and two retaliation and discrimination claims on which Defendant did not move for summary judgment. *See id.*

### 2. Plaintiff's MSPB Complaint in the I-2 Removal Case

As noted, Plaintiff filed the I-2 Removal Case before the MSPB on July 2, 2020, alleging the removal decision was erroneous, that it was retaliation for whistleblowing, and that it violated Title VII and the Rehabilitation Act. *See* ECF No. 1-7 at 4. A hearing was held (regarding both the I-2 Removal Case and the W-2 Whistleblower Case) on March 2, March 3, and April 7, 2021. ECF No. 46-5, ¶ 1. The Administrative Judge issued her decision on the I-2 Removal Case on May 26, 2021, affirming Plaintiff's termination. *Id.*, ¶ 2. She "note[d] at the outset that [she] found [Plaintiff] to lack credibility" based on her evasive answers to questions at the hearing and "inherently improbable" interpretations of "the agency's instructions regarding her communications." *Id.* at 5–6. The Administrative Judge found that the Department established both charges—

failure to follow instructions and conducting unbecoming a federal employee—by a preponderance of the evidence. *See id.*, ¶¶ 5–28.

In connection with the charge of failure to follow instructions, the Administrative Judge noted that, although admitting that she sent each of the six emails the Department identified as support for the charge, Plaintiff maintained (1) that the "instructions prohibiting [Plaintiff] from contacting certain employees was not a valid instruction" because "her communications were protected by Title VII as well as the agency's collective bargaining agreement" and (2) that, even if that instruction was valid, the emails did not violate it because they each "pertained to a complaint of discrimination under Title VII" and were therefore permitted under the exception for EEO communications. ECF No. 41-3 at 6–7. The Administrative Judge rejected both arguments. First, she found that the instruction in the first Notice of Placement on Administrative Leave (which was the one in effect at the time of the communications) was a valid instruction because it allowed Plaintiff to file "Title VII claims using the proper procedures" and because Plaintiff "identified no [collective bargaining agreement] provision limiting the agency's ability to issue the instructions at issue." *Id.* at 6. Second, the Administrative Judge determined that Plaintiff's assertion that each of the emails at issue concerned discrimination was "an inaccurate statement as all of the emails either did not address discrimination issues or included other unrelated issues." *Id.* at 7. The Administrative Judge also found that, although the February 27, 2019, Letter of Instruction was "predominantly addressed to the [five-day] suspension," it also put Plaintiff on notice that she was not allowed to contact high-level officials like Isley or McKinney "about personnel matters" or "processes in which they were not involved" and found Plaintiff's interpretation that the first Notice of Placement on Administrative Leave permitted Plaintiff "to contact any and all agency employees, no matter their position, grade, job duties, or department, regarding any matter concerning a claim

of discrimination concerning her or and other employee" to be "patently unreasonable" and insin-

cere. *Id.* at 8–10. The Administrative Judge sustained all the specifications, finding that each of

the six emails identified above violated the prohibitions in the first Notice of Placement on Ad-

ministrative Leave. *See id.* at 11–21. Specifically, she found that (1) the September 30, 2019,

email, which charged evidence tampering and alleged "unlawful conduct and retaliation against

three other female employees who had filed EEO complaints" was sent to a number of employ-

ees—including Isley and McKinney—who had no "job duties involving EEO matters" and that

Plaintiff provided no evidence that she was "acting as a representative in the EEO complaints

concerning the three other female employees," *id.* at 11–12; (2) the October 1, 2019, email, which,

although it addressed certain important personnel matters (i.e., providing Plaintiff's contact infor-

mation to her new supervisor and seeking approval of a reimbursement claim), also contained

matters that were neither "urgent personnel matters" nor related to discrimination claims, such as

"a potential lunch with an agency employee" and questions about Plaintiff's involvement with the

Future Farmers of America, and, as such, "were not covered by any of the exceptions" in the Notice

of Placement on Administrative Leave, *id.* at 13–14; (3) the September 3, 2019, email, which

concerned the performance standards for another employee was not related to a discrimination

complaint, that Plaintiff was not the other employee's "representative of record in any matter" and

therefore had "no standing or basis to file complaints addressing matters concerning" that em-

ployee, and was sent to officials—including Isley—who had nothing to do with the performance

standards of that employee, *id.* at 15–16; (4) the July 11, 2019, email, which made assertions about

discrimination and retaliation on that other employee's behalf, also included matters not subject to

any of the exceptions in the Notice of Placement on Administrative Leave and was sent to em-

ployees and officials—including Isley and McKinney—with no involvement in the matters

24

asserted, *see id.* at 16–18; (5) the August 12, 2019, email, in which Plaintiff complained about not receiving a response to her July 11, 2019, email, and alleged ethical breaches by an agency attorney, was sent to employees and officials—including Isley and McKinney—with no involvement in the matters asserted, *see id.* at 18–19; and (6) the April 29, 2019, email, which concerned the suspension of Plaintiff's security clearance and was characterized (by Plaintiff) as an "informal EEO complaint" was sent to Isley and McKinney, who Plaintiff conceded "were not involved in the processing of EEO matters," as well as employees of the Personnel and Document Security Branch, none of whom were covered by the exceptions in the Notice of Placement on Administrative Leave, *see id.* at 19–20.

The Administrative Judge also sustained the charge of conduct unbecoming a federal employee, which was based on two emails Plaintiff sent on March 11, 2019, regarding her workstation that included allegedly "unsubstantiated" assertions. *See id.* at 23, 28. To repeat, the first email asserted that "Rodney [Grimes] of Facilities inspected [Plaintiff's] desk in Room 3846-S and determined that it is his expert opinion that he cannot fix the keyboard tray . . . and that he recommends that [Plaintiff] be moved to the desk in Room 4603-S"; the second, that "USDA facilities" had recommended relocating Plaintiff's workstation to Room 4603-S. *Id.* at 24; *see also* ECF No. 46-5, ¶¶ 10–11. The Administrative Judge found not credible Plaintiff's testimony that Grimes had told Plaintiff that the keyboard tray on the desk in Room 3846-S could not be fixed and that he would "verbally recommend[]" to Caldera that Plaintiff be moved to Room 4603-S. ECF No. 41-3 at 25. Rather, she credited Grimes' testimony that he told Plaintiff her keyboard tray was properly installed; that Plaintiff rejected his offer to move it over "a couple of inches to make it more accessible" because she appeared to want to move offices; and that he spoke to Caldera not to recommend relocation—a matter over which he had no authority—but to "'cover[]' himself"

because Plaintiff seemed dissatisfied with his work—all of which was corroborated by a nearly contemporaneous email Grimes sent to his supervisor in the Facilities Operations section. *Id.* at 22–23.

As to Plaintiff's affirmative defenses, as relevant here, the Administrative Judge found that Plaintiff had withdrawn her claim of disability discrimination and her claim of retaliation for seeking a reasonable accommodation for her disability. *See id.* at 43. She further determined that Plaintiff had not shown that she was terminated in retaliation for protected EEO or for whistleblower activity. *See id.* at 43–50. Although she found that Caldera had notice of Plaintiff's protected EEO activity, she further found that there was no evidence that Anderson, the deciding official, had such notice or any motive to retaliate and no showing that, "but for [Plaintiff's] activity, the agency would not have taken the removal action." *Id.* at 42. The Administrative Judge also found that, although Plaintiff had engaged in whistleblowing activity, she had not shown that it motivated her termination because (1) there was no evidence that Plaintiff's allegations of mail tampering between January and October 2018 were a contributing factor in "Caldera's proposal to remove her more than a year later" or Anderson's decision to remove her, *id.* at 45; (2) there was no evidence that Caldera or Anderson was aware of Plaintiff's March 2, 2019, report of mail tampering to the OIG Ombudsman and ethics office for Trade and Foreign Agricultural Affairs, *see id.* at 45–46; (3) Plaintiff's allegation that her five-day suspension violated the collective bargaining agreement was a "clear[] misread[ing]" of that document and therefore would not have motivated retaliation from Caldera or Anderson, *id.* at 46–47; (4) an internal agency investigation determined that Plaintiff's accusation that Caldera violated Department policy by bringing alcohol onto the premises was unfounded and there was no evidence that it contributed to Calder's proposal to terminate Plaintiff or Anderson's decision to terminate plaintiff, although there was some

evidence that Plaintiff's allegation was an attempt to retaliate against Caldera for proposing Plaintiff' five-day suspension, *see id.* at 48–49; (5) Plaintiff's belief that her performance standards violated MSPB case law was not a protected disclosure and even if it was, there was no showing that it contributed to Caldera's proposal or Anderson's decision to terminate Plaintiff, *see id.* at 49; and (6) there was no evidence that Caldera or Anderson was aware that Plaintiff had filed a complaint with the Office of Special Counsel in June 2019 and no evidence that such filing contributed to the decisions at issue, *see id.* at 49–50.

Finally, the Administrative Judge found that the sanction of termination was appropriate for the "serious charges" that had been established.  *Id.* at 51–55.

### 3.  District Court Proceedings

The Administrative Judge's decision became final on June 30, 2021, *see* ECF No. 41-3 at 56, and Plaintiff filed this case on July 29, 2021, *see* ECF No. 1.  As noted, this case concerns Plaintiff's termination and alleges gender discrimination (Count I), disability discrimination (Count II), and retaliation (Count III), and challenges the MSPB's May 26, 2021, decision (Counts IV & V).  The undersigned has already recommended finding that the Court lacks jurisdiction over Plaintiff's challenge to the MSPB's June 24, 2021, decision (Count VI).

On July 16, 2024, Defendant filed its Motion for Summary Judgment seeking judgment in its favor on each of Plaintiff's discrimination and retaliation claims and affirmance of the MSPB's decision (or, alternatively in the case of Plaintiff's claim challenging the W-2 Whistleblower Case, dismissal for lack of jurisdiction).  *See* ECF No. 41.  The undersigned granted numerous requests

from both parties for extensions of the briefing schedule, *see* ECF Nos. 42–45, 48–57, and the motion was fully briefed on February 14, 2025, *see* ECF Nos. 46, 58.

## III.    LEGAL STANDARDS

### A.    Review of Mixed Cases

In mixed cases appealed to the district court from the MSPB, the court "applies two standards of review." *Koch v. White*, 251 F. Supp. 3d 162, 170 (D.D.C. 2017). Under the CSRA, a plaintiff is entitled to *de novo* review of claims of discrimination and retaliation. *See id.*; *see also* 5 U.S.C. § 7703(b)(2), (c). The MSPB's decision on a claim not alleging discrimination, on the other hand, is reviewed "on the administrative record" and "may [be] set aside . . . only if it is arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantive evidence or otherwise not in accordance with law."[20] *Rand v. Geithner*, 730 F. Supp. 2d 118, 125 (D.D.C. 2010) (quoting *Barnes v. Small,* 840 F.2d 972, 979 (D.C. Cir. 1988)); *see also, e.g.*, *Robinson v. Duncan*, 775 F. Supp. 2d 143, 157 (D.D.C. 2011). "To show that the MSPB's decision is not arbitrary and capricious, defendant needs only to show that the decision has 'a rational basis in the law.'" *Hanna v. Herman*, 121 F. Supp. 2d 113, 121 (D.D.C. 2000) (quoting *Wilder v. Prokop*, 846 F.2d 613, 620 (10th Cir. 1988)). To assess whether a ruling of the MSPB is supported by substantial evidence, "a court is limited to determining 'whether the agency . . . could fairly and reasonably find the facts that it did,'" keeping in mind that "[a]n agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson*, 775 F. Supp. 2d at 157

---

[20] Insofar as the review is limited to the administrative record, the use of Rule 56 as the vehicle for decision should perhaps be considered merely "'a "pragmatic procedural mechanism"' for review," rather than supplying the applicable standards. *Edwards M.R. v. District of Columbia*, 128 F.4th 290, 295–95 (D.C. Cir. 2025) (Henderson, J., concurring) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (suggesting that a more appropriate "tool on [the district court's] procedural toolbelt" for resolving claims limited to the administrative record might be "a Rule 52 bench trial limited to the administrative record").

(alterations in original) (quoting *Rountree v. Johanns*, 382 F. Supp, 2d 19, 32 (D.D.C. 2005)).  A

reviewing court must not "substitute [its] judgment for that of the [B]oard as to the weight of the

evidence or the inferences to be drawn therefrom."  *Sanders v. Dep't of Homeland Sec.*, 625 F.

App'x 549, 552 (Fed. Cir. 2015) (quoting *Cross v. Dep't of Transp.*, 127 F.3d 1443, 1448 (Fed.

Cir. 1997)).  "Where an administrative judge's findings are predicated on credibility assessments,

such findings 'are "virtually unreviewable[]" and a plaintiff's *de facto* request for the Court to "re-

weigh conflicting evidence" is inconsistent with the reviewing court's function.'"  *Robinson*, 775

F. Supp. 2d at 157 (alteration in original) (quoting *Rountree*, 382 F. Supp. 2d at 32).

### B.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no

genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under

the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a

reasonable jury could return a verdict for the non[-]moving party.'"  *Steele v. Schafer*, 535 F.3d

689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to

any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific

facts showing that there is a genuine issue for trial."  *Id.* at 324.  To establish that a fact is or is not

genuinely disputed, a party must (a) cite specific parts of the record—including deposition testi-

mony, documentary evidence, affidavits or declarations, or other competent evidence—in support

of its position, or (b) demonstrate that the materials relied upon by the opposing party do not ac-

tually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  While the

court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.  Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute).  Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party.  *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  A court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604).  Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C.

2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  Nonetheless, plaintiffs are still obligated to support their allegations by competent evidence.  *Id.*  Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation."  *Id.*

### C.    Discrimination and Retaliation Based on Discrete Acts

The federal sector provision of Title VII provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-16(a).  The government is also prohibited from retaliating against an employee or applicant for engaging in protected activities such as filing an EEO complaint alleging employment discrimination.  *See Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

When a Title VII plaintiff does not offer direct evidence of discrimination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Holcomb v. Powell*, 433 F.3d 889,895 (D.C. Cir. 2006).  Under that framework, the plaintiff must initially establish a *prima facie* case by a preponderance of the evidence.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly situated employees outside the protected class.  *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013).  Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the

challenged retaliatory act. *Rochon*, 438 F.3d at 1219–20. Once the plaintiff succeeds in making her *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In employment discrimination and retaliation cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory or non-retaliatory reasons for its actions. Where an employer has done so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (italics in original). Even in *Brady*, however, the D.C. Circuit implicitly recognized that the plaintiff must "suffer[] an adverse employment action" before the reasons for that action, benign or discriminatory, can be evaluated. *Id.* Both the courts of this District and subsequent panels of the D.C. Circuit have recognized that proceeding to the *Brady* analysis may be premature when the defendant contests whether an adverse employment action occurred at all. *See, e.g., Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146 (D.D.C. 2010); *cf. Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("*Brady*'s suggested preference for merits resolution on the third prong [of the *McDonnell Douglas* framework] is just that—a suggestion, which the District Court should follow only when feasible.").

If an adverse employment action occurred, the "central question" on summary judgment then becomes whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason

and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). The Court of Appeals has clarified that, in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka*, 156 F.3d at 1289); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

A plaintiff may carry the rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts" that formed the predicate for the employment action, *Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. A plaintiff may also come forward with comparative evidence that persons who are similarly situated to the plaintiff but are of a different race, sex, or age have been treated more favorably by the employer. *Id.*

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Rather, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## IV.    DISCUSSION

The following analysis addresses each of Plaintiff's claims other than Count VI, which is discussed above in Section II. Ultimately, the undersigned finds that the Court lacks jurisdiction over Plaintiff's claims under the Rehabilitation Act (which are Count II and part of Count III) because Plaintiff failed to exhaust them before the MSPB and that, ignoring any jurisdictional defects, Defendant has established that it is entitled to summary judgment on Counts I through V.

### A.    Gender and Disability Discrimination

#### 1.    Exhaustion

"Government employees alleging discrimination in violation of Title VII or challenging personnel practices prohibited by the Civil Service Reform Act must exhaust administrative remedies before bringing their claims to federal court." *Hornsby v. Thompson*, No. 22-cv-1472, 2023 WL 196185, at *3 (D.D.C. Jan. 17, 2023) (quoting *Hamilton*, 666 F.3d at 1349 ), *reconsideration denied*, 2024 WL 3359505 (D.D.C. July 10, 2024). "An employee who intends to pursue a mixed case has several paths available to her. At the outset, the aggrieved party can choose between filing a 'mixed case complaint' with her agency's EEO office and filing a 'mixed case appeal' directly with the MSPB." *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999) (footnotes omitted).

34

A plaintiff who chooses to bring a mixed case before the MSPB must exhaust her claims in that forum. *See, e.g.*, *Jones v. U.S. Dep't of Just.*, 111 F. Supp. 3d at 31 ("A plaintiff may file a mixed-case complaint with his agency's EEO office or with MSPB, but not both. 'Whichever is filed first shall be considered an election to proceed in that forum,' and a plaintiff must then exhaust his remedies in that forum." (internal citations omitted) (quoting 29 C.F.R. § 1614.302(b))). That is, to exhaust a discrimination claim before the MSPB, an employee must "raise his or her claims of discrimination and present evidence in support of those claims" to the Board. *Coffman v. Glickman*, 328 F.3d 619, 624 (10th Cir. 2003). And, significantly, exhaustion must be determined on "a 'claim-by-claim' analysis." *Kelly v. Raimondo*, No. 20-cv-3203, 2022 WL 14807447, at *7 (D.D.C. Oct. 26, 2022) (quoting *Webster v. Del Toro*, 49 F.4th 562, 567 (D.C. Cir. 2022)).

Exhaustion requirements can be jurisdictional or non-jurisdictional. *See, e.g.*, *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 41 (D.D.C. 2022) ("Administrative exhaustion is a doctrine of many stripes. It can be jurisdictional or non-jurisdictional."). "The distinction is of considerable consequence" to litigants because

> [t]o the extent the requirement is jurisdictional, the plaintiff bears the burden of alleging facts sufficient to establish that he or she exhausted administrative remedies and bears the ultimate burden of proof. In contrast, to the extent it is non-jurisdictional, the failure to exhaust constitutes an affirmative defense, and thus the defendant must raise the defense and bears the burden of proof.

*Kelly*, 2022 WL 14807447, at *6 (citations omitted) (quoting *Williams v. Brennan*, 320 F. Supp. 3d 122, 127 (D.D.C. 2018)). Here, Defendant has not argued that Plaintiff failed to exhaust her administrative remedies for any of the claims at issue. Accordingly, it has forfeited that affirmative defense as to any claim for which exhaustion is a non-jurisdictional requirement. *See Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1099 (D.C. Cir. 2021) ("[A] a nonjurisdictional, mandatory exhaustion requirement functions as an affirmative defense, and thus can be waived or forfeited

by the government's failure to raise it."). But "federal courts . . . have 'an independent obligation to determine whether subject-matter jurisdiction exists,' even when jurisdictional defects are not specifically identified by the parties." *Flaherty v. Ross*, 373 F. Supp. 3d 97, 103 (D.D.C. 2019) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)); *see also, e.g.*, *Lamb v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 20-cv-3036, 2022 WL 203433, at *6 & n.2 (D.D.C. Jan. 24, 2022) (dismissing a claim for failure to exhaust even where the defendants "concede[d] that [the plaintiff] 'arguably' exhausted" his claims).

"[F]or claims arising under most anti-discrimination statutes, . . . exhaustion does not determine the Court's subject-matter jurisdiction." *Kelly*, 2022 WL 14807447, at *6. As relevant here, exhaustion requirements under Title VII are "not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 551 (2019). Because by failing to raise it, Defendant has forfeited any argument that Plaintiff's failure to exhaust her claims alleging violation of Title VII require dismissal, there is no reason to further analyze that issue.

"But the Rehabilitation Act is different. In some circumstances, a Rehabilitation Act plaintiff's failure to exhaust is a jurisdictional bar to her civil suit." *Kelly*, 2022 WL 14807447, at *6; *see also, e.g.*, *Al'Zaiem v. Mayorkas*, No. 22-cv-3804, 2023 WL 4999177, at *5 (D.D.C. Aug. 24, 2023) ("Failure to exhaust Rehabilitation Act claims, however, often deprives the Court of jurisdiction."). The D.C. Circuit has held that, because that statute "limits judicial review to employees 'aggrieved by the final disposition'" of their administrative claims, a federal court's jurisdiction depends on whether those claims were the subject of a "final disposition" in the administrative proceedings. *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006) (quoting *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)); *see also Doak v. Johnson*, 798 F.3d 1096, 1103–04 (D.C. Cir.

2015) (holding that the district court had jurisdiction over a Rehabilitation Act claim that was finally adjudicated in administrative proceedings even though the claimant failed to comply with certain agency-imposed procedural requirements during those proceedings). As to her claims under the Rehabilitation Act, then, Plaintiff "bears the burden of showing that [she] has exhausted [her] administrative remedies in a manner sufficient to establish subject-matter jurisdiction." *Kelly*, 2022 WL 14807447, at *7.

She has not done so. The record here includes her administrative complaint before the MSPB,[21] the Administrative Judge's summary of the pre-hearing conference, and the Administrative Judge's decision in the I-2 Whistleblower Case, which together demonstrate that failure. The administrative complaint alleged that procedural defects infected the agency's decision to remove her, that the charges against her were not proved, and that her termination was retaliatory. *See* ECF No. 1-7. It also asserted that Plaintiff was "wrongfully terminated" because of "Title VII and Rehabilitation Act Discrimination." *Id.* at 23–24. However, the Administrative Judge's summary of the pre-hearing conference asserts that Plaintiff "was withdrawing her claim of disability discrimination." ECF No. 1-8 at 1. Likewise, the Administrative Judge's decision notes that Plaintiff had withdrawn her disability discrimination claim. *See* ECF No. 1-9 at 42. A claim that is withdrawn during administrative proceedings is not exhausted. *See, e.g.*, *Holland v. Dep't of Health & Hum. Servs.*, 51 F. Supp. 3d 1357, 1368 (N.D. Ga. 2014) ("When Plaintiff withdrew her claims from the MSPB, she abandoned those claims before the MSPB and failed to exhaust her administrative remedies there."); *see also, e.g.*, *Tyson v. Brennan*, 277 F. Supp. 3d 28, 37 (D.D.C. 2017) (similar); *Houser v. Shulkin*, 264 F. Supp. 3d 17, 22 (D.D.C. 2017) (finding that where the plaintiff

---

[21] Calling it an "administrative complaint" is not quite accurate. When an employee brings a case before the MSPB, it is an appeal of the agency's decision and a claim of discrimination or retaliation "is made as an affirmative defense." *Hornsby v. Thompson*, No. 22-cv-1472, 2023 WL 196185, at *5 n.3 (D.D.C. Jan. 17, 2023). The undersigned nevertheless uses that term for the sake of simplicity.

37

"did not . . . fully litigate [her claim] before the MSPB, she failed to exhaust her administrative remedies"); *Calabrese v England*, No. 05-cv-149, 2006 WL 8452855, at \*4–6 (S.D. Cal. Mar. 14, 2006) (finding the plaintiff's claims of disability discrimination unexhausted where the record showed that he raised the claims before the MSPB but later represented that he would not pursue them and thus "support[ed] a finding [he] abandoned his discrimination claims in his MSPB case"). And so, the record in this case makes clear that Plaintiff failed to exhaust her administrative remedies before the MSPB because she withdrew her claim of disability discrimination under the Rehabilitation Act prior to the final administrative disposition of her case. Accordingly, the undersigned recommends dismissing for lack of jurisdiction Count II, which asserts that Plaintiff was terminated because of her disability in violation of the Rehabilitation Act.[22]  *See Kelly*, 2022 WL 14807447, at \*7 (noting that if the plaintiff fails to demonstrate exhaustion of administrative remedies sufficient to establish subject-matter jurisdiction "with respect to a claim [under the Rehabilitation Act], the Court must dismiss the claim for lack of subject-matter jurisdiction").

2.    The Merits

Even if the Court had jurisdiction over Plaintiff's claim for discrimination under the Rehabilitation Act (Count II), it would fail on the merits, as does her claim for gender discrimination

---

[22] There can be no argument that the claim was somehow exhausted along with Plaintiff's EEO claims discussed in *Robb I*. As noted, once an employee files a petition with the MSPB, she has elected to proceed in that forum and must exhaust administrative remedies there. *See, e.g.*, *Stoll v. Principi*, 449 F.3d 263, 265–66 (1st Cir. 2006) ("The lodging of either a formal appeal with the Board or a formal complaint with the agency demarcates the point of no return. From that point forward, the complainant must exhaust her claim in the chosen forum." (internal citations omitted)); *Economou v. Caldera*, 286 F.3d 144, 149 (2d Cir. 2002) (similar). And so, because Plaintiff raised a claim before the MSPB that her termination constituted disability discrimination, she had to fully exhaust the claim before that tribunal. In any event, the final agency decision in *Robb I* makes clear that no claim alleging that Plaintiff was removed from federal service because of her disability was raised with or decided by the agency. *See* 2025 WL 1025084, at \*8 (listing the claims "accepted . . . for decision"). Indeed, no claim related to Plaintiff's termination *could* have been raised or decided there, because the final agency decision was issued on January 20, 2020, *see id.*, and the Notice of Proposed Removal and ensuing Notice of Decision were not issued until after that date, *see* Ex. R to Mot. for Summary J., *Robb I*, 2025 WL 1025084 (20-cv-929), ECF No. 56-20 (Notice of Proposed Removal issued on March 18, 2020); Ex. U to Mot. for Summary J., *Robb I*, 2025 WL 1025084 (20-cv-929), ECF No. 56-23 (Notice of Decision issued on June 2, 2020).

under Title VII (Count I).  Defendant maintains that there is no evidence that Plaintiff was termi-

nated because of gender discrimination; instead, the evidence shows she was terminated "because

of her well-documented six instances of failure to follow instructions and due to conduct unbe-

coming, which included being untruthful," legitimate non-discriminatory reasons that Plaintiff has

failed to show were pretextual.  ECF No. 41-1 at 19–22; *see also* ECF No. 58 at 4–8.  Defendant

is correct that Plaintiff has failed to adduce evidence that her termination based on the specifica-

tions in the June 2, 2020, Notice of Decision was a pretext for gender or disability discrimination.

Plaintiff's opposition argues (1) that her termination was wrongful and should not have

been upheld by the MSPB, *see* ECF No. 46 at 4–9, which is a claim under the CSRA,[23] *see Perry*,

582 U.S. at 423 (characterizing an argument "that 'the agency had insufficient cause for taking

action under the CSRA'" as a "civil-service claim"  (quoting *Kloeckner*, 568 U.S. at 44)); (2) that

her "termination was a result of retaliation," ECF No. 46 at 9–10 (initial capitalization omitted);

and (3) that the MSPB decision in the W-2 Whistleblower Case was erroneous, *see id.* at 10–13.

---

[23] To the extent that Plaintiff attempts to attack the specifications in Caldera's Notice of Proposed Removal or Ander-son's decision sustaining them as inadequate non-discriminatory reasons for Plaintiff's termination, she fails.  In *Figueroa*, the D.C. Circuit identified four factors that are likely "to be paramount in the analysis [of whether the employer has sufficiently supported its nondiscriminatory reason for the adverse employment action] in most cases": (1) whether the employer has "produce[d] evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) whether, if the factfinder believed the evidence, he or she would "reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason"; (3) whether that nondiscriminatory explana-tion is "facially 'credible' in light of the proffered evidence"; and (4) whether the evidence "present[s] a 'clear and reasonably specific explanation.'"  923 F.3d at 1087–88 (first quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004); then quoting *Bishopp v. District of Columbia*, 788 F.2d 781, 788–89 (D.C. Cir. 1986); and then quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)).  Here, Plaintiff has not challenged the admissibility of any of the evidence supporting Defendant's explanation.  *See id.* at 1088 (finding the first factor met where the plaintiff did not challenge the admissibility of the supporting evidence).  The evidence is "facially nondis-criminatory" and supports the reason offered by Defendant for Plaintiff's termination.  *Id.*  Finally, the reasons are clearly and specifically laid out in the Notice of Proposed Removal and the Notice of Decision—Plaintiff was termi-nated because Defendant believed that she had violated prohibitions articulated in the February 27, 2019, Letter of Instruction and the April 4, 2019, Notice of Placement on Administrative Leave and made misrepresentations about Grimes' conduct and statements regarding her workstation, which interfered with the efficiency of the Department. *See* ECF No. 1-5 at 1–9; Ex. U to Mot. for Summary J., *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23. In any case, Plaintiff has not even attempted to address the *Figueroa* factors, and so has forfeited any argument that Defendant's legitimate nondiscriminatory reason for Plaintiff's termination is inadequate under that case and its prog-eny.

Her brief in *Robb I* addressed her termination claim in a section headed "The Plaintiff's Wrongful Termination Claims Should Proceed on Disability Discrimination and Retaliation," but that section (1) true to its word, does not address gender discrimination and (2) failing to live up to its promise, does not suggest that a disability was the reason for Plaintiff's termination, but rather only that Defendant retaliated against her for seeking a reasonable accommodation, *see* Opp. to Mot. for Summary J. 24–26, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59 (likening the alleged retaliation in this case to that in *Egei v. Johnson*, 192 F. Supp. 3d 81 (D.D.C. 2016), which is discussed more thoroughly below).[24]   Indeed, Plaintiff's opposition in *this* case uses the word "gender" only once, merely in the context of a hypothetical in which a supervisor calls an employee "some racially or gender based derogatory term" (which is not the case here[25]), *see* ECF No. 46 at 10; and the word "disability" only when describing her Complaint, *see id.* at 2; generally introducing the concept of a mixed case, *see id.* at 3; stating that "a finding of . . . disability discrimination is irrelevant" to a court's review of "MSPB resolutions of nondiscrimination claims," *id.* at 4; asserting that Plaintiff's "workstation impacted her disability," *id.* at 10; and noting that there are "differences between MSPB whistleblower protection law and the traditional Title VII or [d]isability discrimination or retaliation law" when addressing the W-2 Whistleblower Case, *id.* at 12. That is, Plaintiff makes no attempt to marshal evidence that would tend to show that she was

---

[24] There is a throwaway line in Plaintiff's Opposition to the Motion for Summary Judgment that she "challenges the entire [reasonable accommodation] process which is essentially a discrimination complaint." Opp. to Mot. for Summary J. 25–26, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. She does not explain that gnomic pronouncement and the undersigned will not attempt to do so for her. "Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

[25] In *Robb I*, Plaintiff asserted that two managers who were not involved in Plaintiff's termination used a gendered phrase—"young lady"—as support for her gender discrimination claim related to adverse employment actions other than her termination. *See Robb I*, 2025 WL 1025084, at *4 n.8, *15. The undersigned found that the use of the phrase did not tend to show that Plaintiff suffered from gender discrimination. *See id.* at *15–16.

terminated because of her gender or because of a disability. Defendant's motion for summary judgment on Counts I and II (assuming there is jurisdiction over Count II) should be granted.

### B. Retaliation

#### 1. Exhaustion

Count III of the Complaint alleges retaliation in violation of Title VII and the Rehabilitation Act. *See* ECF No. 1 at 9. Again, Defendant has not argued that Plaintiff failed to exhaust her retaliation claims, so it has forfeited that defense as to alleged retaliation for conduct protected under Title VII. *See* Section IV.A.1, *supra*. However, as discussed above, "the Rehabilitation Act is different" and requires Plaintiff to "show[] that [she] has exhausted [her] administrative remedies in a manner sufficient to establish subject-matter jurisdiction." *Kelly*, 2022 WL 14807447, at *6–7. Again, she has failed to do so.

Recall that the specifications in one of the charges that led to Plaintiff's removal cited two emails sent on March 11, 2019, concerning complaints about her workstation and requests to be moved to a different one. *See* Ex. U to Mot. for Summary J. 2, *Robb I*, 2025 WL 1025084 (20-cv-929), ECF No. 56-23. Plaintiff contends that she was "disciplined for engaging in attempting to secure [a] reasonable accommodation." Opp. to Mot. for Summary J. 25, *Robb I*, 2025 WL 1025084 (20-cv-929), ECF No. 59. The only claim in Plaintiff's administrative complaint alleging retaliation related to a disability asserts that she requested a disability accommodation regarding her workstation and that management "can't . . . retaliate against an employee for bringing an ADA . . . disclosure." ECF No. 1-7 at 19–20. However, the Administrative Judge's summary of the prehearing conference asserts that Plaintiff "was withdrawing . . . her claim of retaliation for requesting reasonable accommodation." ECF No. 1-8 at 1. The Administrative Judge's decision similarly relates that Plaintiff "asserted that she was subjected to retaliation for requesting reasonable

accommodation" but that she had withdrawn "her claims regarding a failure to accommodate." ECF No. 41-3 at 43. As such, there is no further discussion in that decision of alleged retaliation based on Plaintiff's request for accommodation. Because Plaintiff withdrew her claims alleging retaliation for requesting a reasonable accommodation from consideration by the MSPB, the undersigned recommends dismissing Count III to the extent it is based on the Rehabilitation Act for the reasons discussed above in Section IV.A.1.

The following section nevertheless discusses the merits of that retaliation claim, as well as the other retaliation claims over which the Court undoubtedly has jurisdiction because they were ruled on by the MSPB or because Defendant has forfeited any argument as to non-exhaustion.

2.    The Merits

Defendant contends that Plaintiff "cannot, in the first instance, make out a prima facie case [for retaliation], as she cannot show that her removal was in retaliation for any protected conduct." ECF No. 41-1 at 22; ECF No. 58 at 10. It reasons that, because Plaintiff was terminated for "repeatedly fail[ing] to follow her supervisor's instructions and [lying] to her superiors about the need for an office move," ECF No. 41-1 at 21, she has "fail[ed] to establish that she was removed due to protected conduct, the core of a retaliation claim," ECF No. 58 at 8. That appears to confuse whether Plaintiff has established a prima facie case with whether she has established "the ultimate factual issue in the case—retaliation *vel non*." *Breiterman v. U.S. Cap. Police*, 15 F.4th 1166, 1173 (D.C. Cir. 2021) (quoting *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). In any event, *Brady* and its progeny counsel that, where the defendant has offered a nondiscriminatory reason for its adverse employment action—as Defendant has here—courts generally need not perform the "sideshow" of "decid[ing] whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."[26]

---

[26] Plaintiff does not argue that she has direct evidence of retaliation—which would allow her to "bypass the *McDonnell Douglas* framework," *Francis v. Perez*, 970 F. Supp. 2d 48, 62 (D.D.C. 2013)—and any such argument would fail.

*Brady*, 520 F.3d at 494.  Appropriately, Defendant also argues that, assuming Plaintiff made out a prima facie case, she cannot show that Defendant's nondiscriminatory reasons for firing her—her failure to follow instructions and engaging in conduct unbecoming a federal employee—were pre-textual.  *See* ECF No. 41-1 at 22; ECF No. 58 at 10–11.

Plaintiff's opposition on this issue cites a single case, *Egei v. Johnson*, 192 F. Supp. 3d 81 (D.D.C. 2016), but includes no substantive discussion of it or of her retaliation claim.  *See* ECF No. 46 at 9–10.  Instead, she refers the reader to her Opposition to Defendant's Motion for Summary Judgment in *Robb I*.  *See id.* at 9.  And so, the undersigned begins there.

There, Plaintiff starts by insisting that, under Department policy, she "had a right to send" the six emails that comprised the specifications in the charge for failing to follow instructions.  Opp. to Mot. for Summary J. 22, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59.  As support, she points to a memorandum from Foreign Agricultural Service Administrator Isley outlining the Service's anti-harassment policy and procedures providing that complaints of harassment should be reported "to agency management"—which Plaintiff asserts includes Isley and Under Secretary McKinney—"the Office of Civil Rights[,] or the agency Compliance, Security and Emergency Planning division"; her affidavit, which states that she "had a cordial relationship with" McKinney, who called Plaintiff his "sage advisor"; and the Department's anti-harassment policy, which encourages those who have been victims of harassment to "complain directly to the harasser."[27]  *Id.* at 22–23; *see also* Exs. 4 (Plaintiff's Affidavit), 16 (Isley Anti-Harassment Memorandum), 17 (Department

---

Courts have found that circumstances like those at issue here—an adverse employment action premised on an employee's failure to follow instructions from management to stop sending complaints, including complaints of discrimination, to senior agency officials—do not "constitute[] direct evidence of retaliation."  *Mason v. Geithner*, 811 F. Supp. 2d 128, 204 (D.D.C. 2011), *aff'd*, 492 F. App'x 122 (D.C. Cir. 2012); *see also Byrd v. Vilsack*, 931 F. Supp. 2d 27, 43 (D.D.C. 2013) (citing *Mason*, 811 F. Supp. 2d at 204–05).

[27] As noted above, Plaintiff claims that her July 11, 2019, email, which was sent to, among others, the head of the Office of Process, Product, and Trade Regulation Karina Ramos, concerned alleged harassment by Ramos.  *See* ECF No. 46 at 6; *see also* ECF No. 41-3 at 17–18.

43

Anti-Harassment Policy) to Opp. to Mot. for Summary J., *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59-2 at 151, 650–56. That evidence may support Plaintiff's assertion that she believed she was entitled to send the emails, *but see* Section IV.C, *infra*; however, "'[t]he core inquiry' on summary judgment is . . . 'whether [Plaintiff] has produced sufficient evidence for a reasonable jury to find that [the employer] did not "honestly believe in the reasons it offer[ed]"'" for the [adverse employment action]." *Robb I*, 2025 WL 1025084, at *17 (second alteration in original) (quoting *Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 1549995, at *19 (D.D.C. Oct. 27, 2022), *aff'd*, No. 22-5310, 2024 WL 3219489 (D.C. Cir. June 28, 2024) (per curiam)). That is, "[u]ltimately, it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.'" *Hartzler*, 2022 WL 1549995, at *19 (quoting *Crockett v. Richardson*, 127 F. Supp. 2d 40, 47 (D.D.C. 2001)). Here, Defendant has asserted that those six emails violated the February 27, 2019, Letter of Instruction indicating that Plaintiff must not communicate about personnel issues "with parties not involved in the process" like Isley and McKinney and that she must "use the proper channels" and "not bypass procedure" going forward; and violated the April 4, 2019, Notice of Placement on Administrative Leave prohibiting Plaintiff from, among other things, "contact[ing] any employees of the Agency or Department with regard to any work matters, unless specifically authorized to do so," with exceptions for "EEO, EAP, Union Officials/Reps, or NFC, EPP as appropriate." ECF No. 1-5 at 16, 97. Importantly, the question here "is not whether [Plaintiff] in fact contravened the letter of the management directive[s], but rather whether [her] supervisors 'honestly and reasonably believed' that [she] did." *Mason*, 811 F. Supp. 2d at 205 (quoting *Brady*, 520 F.3d at 496).

Plaintiff has not shown that Defendant's belief that those directives prohibited the conduct included in the six specifications for failure to follow instructions was unreasonable or dishonest. The closest she comes is her contention that the Department "correct[ed] the policy as to whom Plaintiff could contact" when it issued the January 17, 2020, Notice of Administrative Leave, which included slightly different wording as to the exceptions to the restriction upon Plaintiff "contact[ing] any employees of the Agency or Department with regard to any work matters": "This contact restriction includes an exception where you may contact Agency employees who have direct involvement with the following matters: **EEO (Equal Employment Opportunity), EAP (Employee Assistance Program), or NFC (National Finance Center) EPP (Employee Personal Page)**." Opp. to Mot. for Summary J. 24, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59; ECF No. 1-5 at 21 (emphasis in original). That, Plaintiff insists, "is tantamount to admitting the Plaintiff had a right before to contact any management official." Opp. to Mot. for Summary J. 24, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. On the contrary, the Notice issued on January 17, 2020, explicitly states that it was issued "to provide *clarification* about the communication restrictions with USDA employees that were detailed in the February 29, 2019[,] Letter of Instruction and [i]n [the] April 4, 2019[,] Notice of Placement on Administrative Leave." ECF No. 1-5 at 21 (emphasis added). To "clarify" something means to "make clear or easier to understand" or to "elucidate." *Clarify*, American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=clarify [https://perma.cc/U7ES-66ZH]. That clarification did not, as Plaintiff would have it, "change[]" or "correct[]" or "increase[]" any restrictions in the earlier Notice; it elucidated them. Opp. to Mot. for Summary J. 23–24, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. Thus, the January 17, 2020, Notice of Administrative Leave cannot do the work Plaintiff asks it to do. And "[w]here, as here, 'the employer's stated belief about the underlying

facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Mason*, 811 F. Supp. 2d at 205 (alteration in original) (quoting *Brady,* 520 F.3d at 495). In short, Plaintiff has not shown that Caldera (who issued the Notice of Proposed Removal) or Anderson (who approved Plaintiff's removal) did not "honestly and reasonably believe[]" that Plaintiff had "contravened . . . the management directive[s]" in the February 29, 2019, Letter of Instruction and the April 4, 2019, Notice of Placement on Administrative Leave. *Id.*(quoting *Brady*, 520 F.3d at 496).

Plaintiff then appears to argue that the restrictions on her communications were themselves illegal:

> There's no restriction in Title VII or the Rehabilitation Act as to whom the Plaintiff can only complain about discrimination. Anti-retaliation provisions make it unlawful to discriminate because an individual has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing under Title VII . . . [or] the Rehabilitation Act . . . . This language, known as the "participation clause," and provides protection from retaliation for many actions, including filing or serving as a witness *for any side* in an administrative proceeding or lawsuit alleging discrimination in violation of an EEO law.

Opp. to Mot. for Summary J. 24, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. Plaintiff's argument alludes to—without explicitly discussing—the distinction between the "participation clause" and the "opposition clause" of the antiretaliation provisions at issue, so some explanation will be helpful here.

Title VII's antiretaliation provision makes it unlawful to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The antiretaliation provision applicable to the Rehabilitation Act is materially identical. *See* 42 U.S.C. § 12203(a) (the Americans with Disabilities Act's antiretaliation provision); 29 U.S.C. § 791(f) (incorporating

standards from the Americans with Disabilities Act into the Rehabilitation Act). Each clause co-vers different conduct and provides a different level of protection for that conduct. "The 'opposi-tion clause' protects a broad range of informal actions or statements that employees make in re-sistance to actions they reasonably perceive to be discriminatory. The 'participation clause,' on the other hand, protects an employee's actions in relation to 'official' or 'legal'" proceedings under the statutes, such as "legal efforts, through external processes, to combat . . . discrimination." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 76–77 (D.D.C. 2016) (internal citations omitted). More, the participation clause "forbids retaliation against an employee who 'has made a charge, testified, assisted, or participated *in any manner*' in a protected proceeding," whereas the opposition clause "prohibits an employer from taking action against an employee be-cause she has . . . 'opposed any practice' prohibited" by the statute and "provide[s] only qualified protection against retaliation," *Egei*, 192 F. Supp. 3d at 86, 89 (emphasis in original) (quoting 42 U.S.C. § 2000e-3(a)), for "*reasonable* attempts to contest an employer's discriminatory practices," *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (emphasis added). *See also, e.g.*, *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 346 (6th Cir. 2021) ("To bring a successful claim under the opposition clause, [the plaintiff] must allege facts that she opposed unlawful [employment] practices in a reasonable manner and with a reasonable and good faith belief that the practices violated Title VII."); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1139 (11th Cir. 2020) ("To qualify for protection under the opposition clause, 'the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable.'" (quoting *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989)); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 n.4 (4th Cir. 1998) ("The distinction between participation clause protection and opposition clause protection is significant

because the scope of protection is different. . . . [T]he scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause." (internal citations omitted)).

Plaintiff's suggestion that the emails at issue are covered by the participation clause is not well-taken. In them, Plaintiff made informal complaints to her employer, some of which were about allegedly discriminatory, retaliatory, or harassing conduct—indeed, Plaintiff herself denominated one of the emails at issue an "informal EEO complaint." *See* ECF No. 41-3 at 20. Such informal complaints have been held to be protected by the opposition clause rather than the participation clause. *See, e.g.*, *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48–49 & n.6 (2d Cir. 2012) (holding that conduct preceding a formal EEOC charge, such as participation in an internal investigation, is not protected under the participation clause); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) ("[The participation] clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge . . . ."); *Perry v. Kappos*, 776 F. Supp. 2d 182, 194 (E.D. Va. 2011) (indicating that activity protected by the participation clause cannot occur before an official investigation or proceeding is pending); *Johnson v. Wash. Metro. Area Transit Auth.*, 355 F. Supp. 2d 304, 310 (D.D.C. 2005) ("As to the opposition clause, it protects an employee who complains to her employer about discrimination."); *see also, e.g.*, *Wang*, 206 F. Supp. 3d at 77–78 (finding that the opposition clause but not the participation clause protected the plaintiff's email to personnel in the employer's Office of the Inspector General seeking contact information for the EEO office and her visit to the employer's Office of Civil Rights to state that she had a discrimination complaint). Further, Plaintiff has acknowledged that the emails fall under the protection of the opposition clause. *See* ECF No. 1-4 at 2–3 (acknowledging, in response to the Notice of Proposed Removal, that opposition activity must be exercised in a

"reasonable manner" and arguing that Plaintiff's "email communications were [not] so disruptive"
that they exceeded the bounds of reasonable opposition activity); ECF No. 1-7 at 13–14 (adminis-
trative complaint discussing Plaintiff's "opposition" activity and its reasonableness). Accordingly,
whether the participation clause provides the kind of sweeping immunity Plaintiff implies, the
opposition clause, which is the source of any protection Plaintiff's communications enjoy, cer-
tainly does not. Instead, it requires an employee's conduct to be reasonable.[28] *See O'Day*, 79 F.3d
at 763.

That is borne out by cases in this jurisdiction that have found that restrictions on employ-
ees' communications like the ones Plaintiff complains of are unproblematic and that remarkably
similar allegations cannot survive a defendant's motion for summary judgment on a retaliation
claim. For example, in *Mason*, one of the plaintiffs—an IRS employee—"routinely sent e-mails
to his supervisors and senior IRS officials raising what he claims were 'workplace concerns,'"
including that the performance appraisal process was unlawful and biased. 811 F. Supp. 2d at 160
(quoting the record). "Eventually, [he] was directed to stop sending e-mails detailing his various
grievances directly to senior IRS officials" but "nonetheless continued to send the e-mails," con-
tending that "because he was dissatisfied with his supervisors' responses, he had a right to elevate
his complaints and to have them personally reviewed by the Secretary of the Treasury and even
the President of the United States." *Id.* at 160–61. Thereafter, he was informed of the "proper
channels to use in raising workplace grievances" and directed to use "the procedure for invoking

---

[28] There is a "threshold disagreement among the circuits about whether the propriety of the manner of opposition is
best considered at the prima-facie stage, where the Court must ask whether the employee engaged in protected activity
at all, or at the nonretaliatory-justification-stage, where the Court must ask whether the employer acted for a nondis-
criminatory reason." *Savignac v. Jones Day*, 745 F. Supp. 3d 135, 201 (D.D.C. 2024). The D.C. Circuit appears to
consider it "at the non-retaliatory justification stage." *See id.* That makes some sense given *Brady*'s lack of enthusi-
asm for the "sideshow" of "decid[ing] whether the plaintiff actually made out a prima facie case under *McDonnell
Douglas*" once a defendant has proffered a legitimate non-discriminatory reason for the adverse employment action.
*Brady*, 520 F.3d at 494.

the agency grievance system and EEO apparatus" rather than "sending 'broadcast' communica-
tions to multiple management officials" and "email[ing] senior IRS officials with complaints." *Id.*
at 161–62.  When he failed to comply, he was suspended.  *See id.* at 162.  Similarly, a different
plaintiff "routinely sent e-mails to his supervisors and senior IRS officials raising workplace con-
cerns and grievances," claiming that he had a right to "elevate" his concerns up the chain of com-
mand.  *Id.* at 170–71.  He, too, was instructed to submit his complaints "through the appropriate
channels," such as "the EEO Complaint process."  *Id.* at 171.  But he, too, "continued to e-mail
senior IRS officials with complaints" and was, therefore, suspended and, eventually, terminated.
*Id.* at 172.  Both plaintiffs claimed they were retaliated against for activity protected under Title
VII.  *See id.* at 203, 214.  The IRS argued that they were disciplined for failing to follow the
instructions of management.  *See id.* at 162, 172–73.  Judge Kollar-Kotelly granted summary judg-
ment to the defendant on those retaliation claims.  *See id.* at 206, 214.  The court noted that the
plaintiffs were not "discouraged from raising [their] myriad allegations of discrimination or retal-
iation in the workplace" but rather were "merely directed to raise [their] concerns through 'the
appropriate channels'" and ruled that "there was nothing inappropriate about such an instruction."
*Id.* at 205; *see also id.* at 214 ("Like Mason, Benton has adduced no evidence demonstrating that
he was ever discouraged from raising his myriad allegations of discrimination or retaliation in the
workplace; the Secretary did not run afoul of Title VII merely by directing Benton to raise those
allegations through the appropriate channels and not to senior IRS officials after tolerating Ben-
ton's communications for months.").  Where it was undisputed that the employees were "directed
to cease sending communications raising [their] concerns to senior IRS management . . . , but
[they] nonetheless continued on [their] prior course of conduct . . . , no reasonable trier of fact
could conclude that the [defendant's] proffered justification for [the discipline imposed] was

pretextual." *Id.* at 205–06; *see also id.* at 214 (finding that the plaintiff "failed to adduce sufficient evidence to allow a reasonable trier of fact to doubt that his supervisors 'honestly and reasonably believed' that he had serially violated the management directive" to "raise [] allegations . . . through the appropriate channels" and consequently failed to show that his suspension and termination were retaliatory (quoting *Brady*, 520 F.3d at 496)).

Similarly, in *Byrd v. Vilsack*, the plaintiff "repeatedly included senior management officials in her communications" complaining about her treatment by her supervisor, "despite repeated warnings" to pursue EEO complaints "through the appropriate channels." 931 F. Supp. 2d 27, 43–44 (D.D.C. 2013). After being suspended for failure to follow instructions, she ultimately filed an action under Title VII for retaliation, among other things. *See id.* at 43. In response to the defendant's argument that her "suspension was based on a legitimate, nonretaliatory reason—[her] repeated failure to cease copying senior USDA management officials" on emails complaining of mistreatment, the plaintiff claimed that the suspension was evidence of retaliation because "she was disciplined 'for seeking relief from her higher level superiors' from . . . harassment." *Id.* Then-District Judge Wilkins disagreed. He found that management appropriately "directed [the plaintiff] to route any such complaints through the appropriate channels—and not to simply carbon-copy a myriad of . . . managers on her email responses." *Id.* at 44. He further found that the plaintiff's violations of the directive not to copy "high-level managers" on her complaints of harassment constituted a legitimate nonretaliatory reason for her discipline and that the defendant had established that "its motivation in suspending [her] . . . was based upon 'the manner in which [she] complained of [alleged retaliation], not on the fact that she complained.'" *Id.* (quoting *Rollins*, 868 F.2d at 399 (finding that "habitually bypass[ing] the chain of command by

bringing . . . complaints of discriminatory employment practices directly" to senior officials was a legitimate nonretaliatory reason for denying the plaintiff a promotion)).

So it is here. Plaintiff was not prohibited from complaining about discrimination nor was she prohibited from making such claims to managers. Plaintiff was simply instructed to raise her complaints of discrimination through appropriate channels and not to address them to managers who were not involved in the EEO process. Indeed, Departmental Regulation 4070-735-001 makes clear that violations like sexual harassment and prohibited personnel practices may be reported to "the employee's supervisor[] or any *appropriate* [] management official." Ex. H to Mot. for Summary J. 11, *Robb I*, 2025 WL 1025084 (No. 20-cv-929) (emphasis added), ECF No. 56-10. Plaintiff has adduced no evidence tending to show that her managers did not honestly and reasonably believe that she had failed to comply with those instructions.[29]

Nor does Plaintiff create a genuine issue of fact as to whether Defendant honestly and reasonably believed that Plaintiff had engaged in conduct unbecoming a federal employee when she made unsubstantiated assertions that Grimes had recommended moving her workstation to Room 4603-S. Recall that two emails supported the conduct unbecoming charge: (1) one Plaintiff sent on March 11, 2019, at 12:58 p.m. stating that "USDA facilities . . . recommended that [I] [be] moved to 4603-S," and (2) an email earlier that day stating that "Rodney [Grimes] of Facilities inspected my desk in Room 3846-S and determined that it is in his expert opinion that he cannot fix the keyboard tray on this style of a desk and that he recommends that I be moved to the desk in Room 4603-S." Ex. U to Opp. to Mot. for Summary J. 2, *Robb I*, 2025 WL 1025084 (No. 20-

---

[29] Indeed, at the hearing before the MSPB Administrative Judge, Plaintiff admitted that she knew the Office of Civil Rights addressed complaints of discrimination and that Isley and McKinney had no part in that process. *See* ECF No. 41-3 at 12 ("[Plaintiff] conceded at the hearing that she was aware that Mr. Isley and McKinney had no involvement in EEO matters.").

cv-929), ECF No. 56-23 (first and third alterations in original); *see also* ECF No. 1-5 at 59–60. The Notice of Proposed Removal explained that (1) both emails were sent to employees with no direct involvement in personnel matters like work location assignments, including Foreign Agricultural Service Administrator Isley and the Service's Assistant Deputy Administrator Bertsch[30] and (2) in emails also dated March 11, 2019, both Grimes and his supervisor Davis asserted that Grimes had not recommended the relocation of Plaintiff's workstation, with Grimes explaining that he did not have authority to relocate her.  *See* ECF No. 1-5 at 4–5.  That is, at the time Caldera recommended removal and Anderson approved that removal, they had Plaintiff's statements that Grimes had recommended she be moved to another office and Grimes' and Davis' statements that he made no such recommendation.  Plaintiff does not explain why it was unreasonable for management to believe the version of events set forth by Grimes and Davis over that offered by Plaintiff.  *See McCullough v. Whitaker*, No. 14-cv-296, 2019 WL 171404, at *7 (D.D.C. Jan. 8, 2019) (determining that, when faced with conflicting statement, management "had to decide who to believe," and the fact that it did not believe the plaintiff's version of events "would not alone support a finding of discriminatory [or retaliatory] intent").  The only evidence Plaintiff offers is an Ergonomics Workstation Evaluation dated "March, 2019" that states that the keyboard tray in that office was "improperly installed causing [it] to be wobbly and unstable," which allegedly "contradict[s]" Grimes' assertion that there was "nothing wrong" with the tray.  Opp. to Mot. for Summary J. 21, 25, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59.  Grimes' email actually said that he "checked the keyboard [tray] out and notice[d] no real problem with the keyboard [tray] other than a little movement."  ECF No. 1-5 at 65.  That does not squarely contradict the

---

[30] The fact that the emails at issue predate the April 4, 2019, Notice of Placement on Administrative Leave is immaterial, as these specifications did not support a charge for failing to follow instructions, but, rather, for conduct unbecoming a federal employee.

ergonomics report's conclusion that the tray was unstable. But, more importantly, that ergonomics report says nothing about the statements Caldera and Anderson focused on in the Notice of Proposed Removal and the decision removing Plaintiff—the "unsubstantiated" assertions that Grimes recommended Plaintiff be moved to Room 4603-S. *Id.* at 4; Ex. U to Opp. to Mot. for Summary J. 2, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23. Nor does it contradict Caldera's and Anderson's assertion that Plaintiff improperly copied extraneous management personnel on those emails. *See* ECF No. 1-5 at 4–5; Ex. U to Mot. for Summary J. 3, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23 (Notice of Decision finding that Plaintiff' "March 2019 emails regarding [her] workspace . . . were inappropriate" because they "included Administrator Ken Isley and Deputy Administrator Charles Bertsch . . . [who] had no direct involvement in the matter involving [Plaintiff's] seating assignment"). Similarly, the fact that Plaintiff was apparently allowed to telework beginning on March 18, 2019, because, according to Caldera, "she was saying her work station wasn't meeting her needs," ECF No. 46 at 9 (quoting Ex. to Opp. to Mot. for Summary J. 379, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59-2), says nothing about whether Plaintiff sent her March 11, 2019, emails to inappropriate management officials or misrepresented Grimes' statements about relocation. Again, "[w]here, as here, 'the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.'" *Mason*, 811 F. Supp. 2d at 205 (second alteration in original) (quoting *Brady,* 520 F.3d at 495). Plaintiff has thus failed to produce evidence showing there is genuine issue of fact that Department managers did not honestly and reasonably believe that Plaintiff had engaged in the charged conduct unbecoming a federal employee by making unsubstantiated assertions that Grimes recommended

relocating her workstation and by sending emails regarding her workplace location to inappropri-
ate managers.[31]

Plaintiff's reliance on *Egei* does not undermine these conclusions because the case is inap-
posite.  In *Egei*, the plaintiff filed a formal EEO complaint alleging that her supervisor at the Fed-
eral Emergency Management Agency ("FEMA") had sexually harassed her.  192 F. Supp. 3d at
83.  During those proceedings, she testified at a hearing before the EEOC.  *See id.*  The Adminis-
trative Law Judge ("ALJ") found that the plaintiff's testimony at the hearing contradicted her ear-
lier accounts of the alleged harassment and that her story was undermined by FEMA's evidence
that at the time of the alleged harassment, the plaintiff was picking up a rental car at the airport;
the ALJ consequently found, among other things, that "the alleged events did not occur."  *Id.* at
84.  About a year and a half after the ALJ's decision, FEMA terminated the plaintiff "on the basis
of the allegations she had made in her . . . EEO complaint and her sworn testimony before the
EEOC," which it characterized as "falsification of records, inaccurate statements and lack of can-
dor."  *Id.* at 84 (quoting the record).  After exhausting her administrative remedies, the plaintiff
sued FEMA alleging that "she was terminated on the basis of her 2008 EEO charge and the testi-
mony she provided in its support."  *Id.* at 85.  Judge Moss framed the question as "whether the
participation clause shields an employee from adverse action on the basis of *any* testimony she
provides in an EEO proceeding" or whether an employer may "lawfully terminate an employee on
the basis of false or malicious statements made during [such] proceedings[.]"  *Id.* at 86.  Concerned
that "if employees 'bore the risk of discharge whenever they were unable to establish conclusively
the merits of their claims,'" they would "hesitat[e] to raise *bona fide* discrimination claims that

---

[31] The undersigned expresses no opinion on which version of events—Plaintiff's or Grimes' and Davis'—is more
credible, as such determinations are prohibited at the summary judgment stage.  *See, e.g.*, *Barnett*, 715 F.3d at 358.
The undersigned merely finds that Plaintiff has failed to adduce evidence tending to show that Caldera and Anderson
did not reasonably and honestly believe that Plaintiff's assertions were unsubstantiated.

they [were] uncertain they [would] win," Judge Moss ultimately found that "Title VII's participation clause protects an employee from adverse employment action taken on the basis of the substance of a charge or testimony she makes in the course of her participation in Title VII EEO proceedings." *Id.* at 89–91 (quoting *Parker v. Balt. & O.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981)). In doing so, however, he noted that "there are reasonable arguments" in favor of a rule—like the one that applies in the Seventh Circuit—that "only a 'good faith' and 'reasonable' EEO complaint warrants protection under the participation clause," while a claim that rests on falsehoods does not. *Id.* at 88, 90 (quoting *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004)).

In any case, the rule from *Egei* is not applicable here. Plaintiff asserts repeatedly that *Egei* protects an employee from retaliation for the "substance" of "testimony" made in a proceeding addressing charges of discrimination. *See* Opp. to Mot. for Summary J. 24–25, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. That is clear from the opinion, itself, which states that it applies only when "an employer takes adverse action against an employee on the basis of the substance of her EEO claim or testimony offered in support of that claim" and does not "prohibit[] an employer from taking action against an employee for improper behavior outside the scope of EEO proceedings." *Egei*, 192 F. Supp. 3d at 91 (emphasis omitted). Here, none of the emails at issue constituted testimony in such a proceeding, *see Testimony*, Black's Law Dictionary (12th ed. 2024) (defining "testimony" as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition."); rather, they were communications made outside of formal agency or EEO investigation or proceedings. And, as to the communications identified in the specifications for the charge of failure to follow instructions, Plaintiff was disciplined not for the *substance* of those six emails, but because she failed to follow the directions of her supervisor

56

and continued to disseminate her complaints through inappropriate channels.[32]  *See Mason*, 811 F. Supp. 2d at 205–06, 214–15; *Byrd*, 931 F. Supp. 2d at 44; *see also Whatley v. Metro. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1329 (5th Cir. 1980) ("Failing to follow prescribed administrative procedures is not a statutorily protected activity.").  The concern at issue in *Egei*—that, "[i]f an employee can file an EEO complaint, lose on the merits, and then be fired for making false accusations . . . it is not difficult to imagine future employees hesitating to raise *bona fide* discrimination claims that they are uncertain they will win"—is significantly diminished where an employee is not disciplined for the substance of her communications, but rather for the way she disseminated them.  *Egei*, 192 F. Supp. 3d at 90; *see also id.* at 91 ("[These] principles . . . apply primarily to a case, like this one, in which an employer takes adverse action against an employee on the basis of the *substance* of her EEO claim or testimony offered in support of that claim . . ." (emphasis in original)).

Similarly, as the Notice of Proposed Removal and the Notice on Decision establish, Plaintiff was disciplined for the emails representing that Grimes had recommended Plaintiff's relocation to Room 4603-S in part because she included as addressees Isley and Bertsch, who were not involved in seating assignments.  *See* ECF No. 1-5 at 4–5; Ex. U to Mot. for Summary J. 3, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23.  More, Plaintiff makes no attempt to explain how imposing discipline for making a statement deemed false in a request for reasonable accommodation fits with the reasoning of *Egei*.  As discussed in *Robb I*, the reasonable accommodation process is "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'"  2025 WL

---

[32] Anderson, the deciding official, testified that the emails she reviewed were redacted and that their substance was irrelevant to her decision.  *See* ECF No. 41-3 at 8.  A glance at the emails she reviewed confirms that the bulk of their content has been blacked out.  *See* ECF No. 1-5 at 24–62.

1025084, at *11 (quoting *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)). "Both the employer and the employee have a duty to act in good faith" during the process. *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 226 (D.D.C. 2022) (quoting *Koch v. Schapiro*, 759 F. Supp. 2d 67, 76 (D.D.C. 2011)). It involves neither an employee making claims of discrimination, retaliation, or harassment against the employer that must then be proved before an administrative tribunal nor the attendant concerns about allowing an employer to discipline an employee who does not end up proving her case. Indeed, as noted above, the court in *Egei* made clear that its holding was a "limit[ed]" one that applies to cases "in which an employer takes adverse action against an employee on the basis of the substance of her EEO claim or testimony offered in support of that claim." *Egei*, 192 F. Supp. 3d at 91 (emphasis omitted). It did not purport to address alleged retaliation against an employee for requesting a reasonable accommodation under the Rehabilitation Act. As such, *Egei* is too far removed from the situation at issue with Plaintiff's emails from March 11, 2019, to be useful here.

In summary, assuming no jurisdictional bar, the undersigned recommends granting Defendant's Motion for Summary Judgment as to Count III, alleging retaliation under Title VII and the Rehabilitation Act.

### C.    Review of the MSPB Decision

As noted above, a court affords deference to a decision of the MSPB on nondiscrimination claims, which may be set aside only if "arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantive evidence or otherwise not in accordance with law." *Rand*, 730 F. Supp. 2d at 125 (quoting *Barnes*, 840 F.2d at 979); *see also Butler v. West*, 164 F.3d 634, 642 (D.C. Cir. 1999) ("The degree of deference that federal courts must accord MSPB resolutions of nondiscrimination claims speaks directly to its preeminent role in this area." (internal

citation omitted)).  More, "[w]here an administrative judge's findings are predicated on credibility assessments, such findings 'are "virtually unreviewable[]" and a plaintiff's *de facto* request for the Court to "re-weigh conflicting evidence" is inconsistent with the reviewing court's function.'" *Robinson*, 775 F. Supp. 2d at 157 (second alteration in original) (quoting *Rountree*, 382 F. Supp. 2d at 32).

Plaintiff seems to ignore those two standards.  Although she acknowledges that MSPB decisions on nondiscrimination claims "are granted APA-like deferential review," her argument in support of setting aside the decision at issue here reads as if the Court should engage in de novo review of the Board's findings.  ECF No. 46 at 4–9.  For example, Plaintiff asserts that "[e]ach of the two charges was disproven"—apparently inviting the Court to re-weigh the evidence and come to its own conclusion about whether the MSPB got it right.  *Id.* at 4.  And Plaintiff nowhere acknowledges that her burden to overcome any findings based on credibility determinations is a heavy one, made perhaps more punishing here in light of the Administrative Judge's explicit finding "at the outset" of her discussion that Plaintiff "lacked credibility."  ECF No. 41-3 at 5.

### 1.    Decision Sustaining Charge 1 for Failure to Follow Instructions

The Administrative Judge began by noting that "[t]o prove a charge of failure to follow instructions, an agency must establish that the employee was given proper instructions and failed to follow the instructions, without regard to whether the failure was intentional or unintentional." ECF No. 41-3 at 6.  Plaintiff does not challenge that standard and it is well-established.  *See, e.g.*, *Erb v. Dep't of the Treasury*, No. 2021-1756, 2024 WL 1110340, at *5 (Fed. Cir. Jan. 24, 2024) ("Under the Board's standard for proving a charge of failure to follow instructions—which [the plaintiff] does not challenge—'an agency must establish that the employee: (1) was given proper instructions, and (2) failed to follow the instructions, without regard to whether the failure was

intentional or unintentional.'" (quoting *Powell v. U.S. Postal Serv.*, 122 M.S.P.R. 60, ¶ 5 (M.S.P.B. 2014))); *Ahuruonye v. U.S. Dep't of the Interior*, No. 16-cv-1767, 2022 WL 1746656, at *8 (D.D.C. May 31, 2022) ("The Department correctly alleges that it can prove the charge of 'failure to follow instructions' by establishing that (1) the plaintiff was given proper instructions and (2) failed to follow them, without regard to whether the failure was intentional or unintentional."), *aff'd*, No. 22-5239, 2023 WL 5439458 (D.C. Cir. Aug. 24, 2023).  Accordingly, Plaintiff does not contend that the decision was "arbitrary and capricious" because it lacked 'a rational basis in the law.'" *Hanna*, 121 F. Supp. 2d at 121 (quoting *Wilder*, 846 F.2d at 620).  Nor does she claim that it was "obtained without compliance with lawful procedures."  *Rand*, 730 F. Supp. 2d at 126 (quoting *Barnes,* 840 F.2d at 979).  Thus, to establish that this charge should be set aside, Plaintiff must show that it was not supported by substantial evidence.  *See id.*  The Supreme Court has noted that "'substantial evidence' is a 'term of art' used throughout administrative law" to describe a standard for "evidentiary sufficiency [that] is not high"; it is "more than a mere scintilla" and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (first quoting *T-Mobile S., LLC v. Roswell*, 574 U.S. 293, 301 (2015); and then quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Brenner v. Dep't of Veterans Affairs*, 990 F.3d 1313, 1322 (Fed. Cir. 2021) ("We review the MSPB's findings of fact for substantial evidence.  Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Shapiro v. Soc. Sec. Admin.*, 800 F.3d 1332, 1336 (Fed. Cir. 2015))).

Plaintiff argues that she "never had clear notice that she was prohibited from contacting" certain Department employees to whom she sent the six emails that constitute the specifications for this charge because of "several ambiguities" in the instructions she was given.  ECF No. 46 at

5–6.  The Administrative Judge found that "the April 4, 2019 [Notice of Placement on Adminis-

trative Leave] was sufficiently clear that [Plaintiff] was directed not to communicate with agency

personnel except those working in EEO, EAP, NFC, etc."  ECF No. 41-3 at 8.[33]  The question to

be answered, then, is whether that finding is supported by "substantial evidence."  It is.

The Administrative Judge relied on testimony from Anderson (the deciding official) that

Plaintiff knew "she was not permitted to contact" Isley or McKinney "about personnel matters

based on previous instructions" in the February 27, 2019, Letter of Instruction.  *Id.* at 8.  The

Administrative Judge pointed out that, although that letter "predominantly addressed the [five-

day] suspension at issue at th[e] time" it was promulgated, Plaintiff "was put on notice that she

was expected to refrain from contacting the named individuals, high level officials, regarding pro-

cesses in which they were not involved" by, among other things, the instruction that "[m]oving

forward," she must "not bypass procedure."  *Id.* at 9 (quoting ECF No. 1-5 at 97).  The Adminis-

trative Judge noted that Plaintiff knew the proper procedure for filing EEO complaints involved

the Department's Office of Civil Rights and that Plaintiff admitted in her testimony that Isley and

McKinnon "had no involvement in the EEO process."  *Id.* at 10–11, 12.  Addressing Plaintiff's

---

[33] Courts have held that when employees are subject to confusing or ambiguous instructions—as Plaintiff asserts she was here, *see id.* (describing the various alleged ambiguities in the February 27, 2019, Letter of Instruction and the April 4, 2019, Notice of Placement on Administrative Leave)—they must ask for clarification rather than conducting themselves in accordance with a potentially incorrect interpretation of the instruction and consequently facing disci-pline.  *See McFall v. Scalia*, No. 19 Civ. 11581, 2024 WL 2802861, at *12 (S.D.N.Y.  May 28, 2024) (upholding the MSPB's finding that the plaintiff failed to follow instructions that the plaintiff claims were ambiguous because it was incumbent upon her to ask for clarification); *see also Dysthe v. Dep't of Transp.*, 795 F.2d 71, 72 (Fed. Cir. 1986) (stating that employees who are given ambiguous instructions should seek clarification "to clear up the assumed am-biguity" rather than acting in accordance with their interpretation of those instructions).  That rule is consistent with the precept that, under MSPB precedent, a federal employee can be disciplined for failing to follow instructions even if the failure was unintentional.  *See Hamilton v. U.S. Postal Serv.*, 71 M.S.P.R. 547, 555–56 (M.S.P.B. 1996) (over-ruling prior Board precedent requiring proof of intent to sustain a charge for failing to follow instructions and holding that "[a]n agency may prove the charge by establishing that proper instructions were given to an employee and that the employee failed to follow them, without regard to whether the failure was intentional or unintentional").  However, the Administrative Judge did not rest her decision on that principle, so it is not a proper basis on which to affirm the decision at issue.  *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

contention that "based on the plain language" in the April 4, 2019, Notice of Placement on Administrative Leave—which stated, "You are further instructed not to contact any employees of the Agency or Department with regard to any work matters, unless specifically authorized to do so in this letter (Exceptions: EEO, EAP, Union Officials/Reps, or NFC, EPP as appropriate)," ECF No. 1-5 at 16—Plaintiff "was permitted to contact any and all agency employees, no matter their position, grade, job duties, or department, regarding any matter concerning a claim of discrimination concerning her or any other employee," the Administrative Judge rejected it as "a patently unreasonable interpretation" and found Plaintiff's testimony on that issue to be neither "genuine[]," "credib[le]," nor "reliab[le]." *Id.* at 10.  Indeed, Plaintiff's "alleged reasoning" would mean that Isely and McKinney "would be the proper recipients for every complaint or alleged policy violation involving anyone" in the Foreign Agricultural Service, which "would clearly be unworkable and is . . . unreasonable." *Id.* at 19; *see also id.* at 38 n.18.  The Administrative Judge further found that, because "the agency's list of exceptions [in the April 4, 2019, Notice of Placement on Administrative Leave] included departments such as EAP and NFC," the "reasonable interpretation of an exception for 'EEO'" would be that Plaintiff could contact "the agency's EEO office which was the Office of Civil Rights and reference the filing of EEO documents." *Id.* at 19.  The Administrative Judge acknowledged that the January 17, 2020, Notice of Administrative Leave was issued to clarify the restrictions in the prior Notice, but nevertheless found, based on the evidence above, that the prior Notice was sufficiently clear to inform Plaintiff that she must not email either Isley or McKinnon about EEO matters, which Plaintiff knew were outside their purview.  *See id.* at 8.  That unquestionably constitutes "substantial evidence" supporting the finding that Plaintiff had sufficient notice.  And it is undisputed that each of the emails at issue in Charge 1 included

Isley and most of them included Isley and McKinnon. Therefore, the MSPB's decision sustaining each of the specifications in Charge 1 should be affirmed.

But there is further evidence supporting those specifications—evidence Plaintiff fails to address. Even if there were not substantial evidence supporting the Administrative Judge's finding that Plaintiff had notice that she must not bypass proper procedure in making EEO complaints by emailing Isley and McKinnon but nevertheless did so repeatedly—and substantial evidence supports that finding—and even if there were not substantial evidence supporting the Administrative Judge's finding that Plaintiff's interpretation that, consistent with the April 4, 2019, Notice of Placement on Administrative Leave, Plaintiff could report any and all EEO complaints to whomever she pleased was unreasonable—and substantial evidence supports that finding, too—there is still substantial evidence that she failed to follow the instructions in that Notice. Plaintiff focuses on the alleged ambiguity of the restrictions on her reporting of EEO matters and points to Department policy allowing employees to report harassment and similar conduct to "agency management." ECF No. 46 at 5–7. Plaintiff also asserts that "all of the[] communications sent by the Plaintiff complained about discrimination." *Id.* at 6. But the Administrative Judge found that the emails at issue either "did not address discrimination issues or included other unrelated issues." ECF No. 41-3 at 7. Her description of each of the emails bears this out. *See id.* at 11 (noting that the September 30, 2019, email "alleged that there was tampering of evidence in regard to an investigation being conducted into [Plaintiff's] conduct toward another employee"), 13–14 (asserting that the October 1, 2019, email "asked about a potential lunch with an agency employee, sought direction regarding her involvement in the Future Farmers of America (FFA), and requested assistance in returning to work"), 15 (noting that "there is no mention of any discrimination in this email" in the September 3, 2019, email which included a complaint that an employee had been

63

disrespectful to another employee), 17 (asserting that the July 11, 2019, email included allegations that a Department attorney behaved unethically and employees in Human Resources violated Department policies), 18 (asserting that the August 12, 2019, email alleged "additional violations against an attorney at the agency"), 20 (asserting that the April 29, 2019, email requested "'an immediate cease and desist action' regarding the security clearance suspension and requested reassignment"). Plaintiff does not contend that any of those descriptions is inaccurate. Nor does she suggest that there was an exception in the April 4, 2019, Notice of Placement on Administrative Leave for communications related to, for example, participation in the Future Farmers of America or any of the other topics raised in the emails that are unrelated to EEO activity. Accordingly, this presents an additional basis on which to affirm the MSPB's decision.

2.     Decision Sustaining Charge 2 for Conduct Unbecoming a Federal Employee

Plaintiff's attempt to undermine the MSPB's decision on this charge is also unsuccessful.

Again, the Administrative Judge set out the standard for the charge of "conduct unbecoming":

> [A] general charge of conduct unbecoming has no specific elements of proof, but instead is established by proving that the appellant committed the acts alleged in support of the "conduct unbecoming" label. Moreover, such a charge typically involves conduct that is improper, unsuitable, or otherwise detracts from one's character or reputation. The general charge may be sustained as long as the reasons for the proposed action were described in sufficient detail to allow the employee to make an informed reply, and if the efficiency of the service suffered because of the misconduct.

ECF No. 41-3 at 21 (internal citations omitted) (quoting *Canada v. Department of Homeland Security,* 113 M.S.P.R. 509, ¶ 9 (2010)) (citing *Alvarado v. Dep't of the Air Force*, 103 M.S.P.R. 1, 12 (2006), *aff'd*, 490 F. App'x. 932 (10th Cir. 2012); *Soc. Sec. Admin. v. Long*, 113 M.S.P.R. 190, ¶ 42 (2010), *aff'd* 635 F.3d 526 (Fed. Cir. 2011); *Cross v. Dep't of the Army*, 89 M.S.P.R. 62, 68 (2001)). Plaintiff does not challenge that standard, nor does she claim procedural defects here.

And so, again, the question is whether there is substantial evidence to support the MSPB's finding that Plaintiff engaged in conduct unbecoming a federal employee when she sent the March 11, 2019, emails.  And again, there is.

The Administrative Judge noted that, at the hearing, Plaintiff testified that Grimes told her when he inspected her workstation that her "desk was beyond repair" and "asked to see the cubicle [Plaintiff] identified for relocation," asserting that "he would recommend [her] location to that cubicle."  *Id.* at 25.  She also testified that Grimes said he would not put the recommendation in writing but would instead make the recommendation verbally to Caldera because he "wanted to see 'what kind of person' she was."  *Id.*  Grimes, on the other hand, testified that Plaintiff "asked him to look at the work station she preferred and, while he complied with [her] request, he informed her that he has no authority to address decisions about the assignment of employee workstations."  *Id.*

Faced with those divergent stories, the Administrative Judge found Grimes' version of events "far more credible" than Plaintiff's.  *Id.*  She noted that Plaintiff had been agitating to move from the cubicle she then occupied to her preferred location—Room 4603-S—for some time, citing emails Plaintiff sent beginning on March 4, 2019, requesting reassignment to that desk.  *Id.* at 25.  The Administrative Judge also cited Grimes' email of March 11, 2019, in which he explained that, when he inspected the workstation about which Plaintiff was complaining, "Plaintiff suggested that things would work much better if she could relocate to another office space" and "made it clear that doing anything to the keyboard wouldn't fix the problem, her interest was to be relocated."  *Id.* (quoting ECF No. 1-5 at 65).  Grimes wrote that Plaintiff "suggested she show [him] the location" but "at no time did [he] suggest that [she] be moved" and he "[made] it clear that [he] wouldn't be the person to have her relocated."  *Id.* (quoting ECF No. 1-5 at 65).  The

Administrative Judge noted that email was written within one week of Grimes' inspection of Plaintiff's desk and was consistent with his testimony at the hearing. *See id.* at 27. She also found Grimes to be "a credible witness," noting that he "had no personal relationship with [Plaintiff], no personal interest in her work situation or where she was located, and . . . offered consistent and reliable testimony." *Id.* at 27. She further found it "improbable" that Grimes would tell Plaintiff he would recommend to Caldera that Plaintiff be moved because it was "patently unreasonable that a facilities maintenance employee would make recommendations to agency management as to what workstation an employee should be assigned." *Id.* She also noted that Caldera's testimony corroborated Grimes' assertion that he made no such recommendation. *See id.* The Administrative Judge found that Plaintiff's testimony that Grimes "wanted to see 'what kind of person'" Caldera was "[made] no sense" because it had nothing to do with Plaintiff's workstation or her desk assignment. *Id.* In short, the Administrative Judge found credible Grimes' testimony "that the desk did not require repair and that he did not make any recommendation regarding [Plaintiff's] relocation." *Id.* at 28. The parties having stipulated that Plaintiff sent two emails on March 11, 2019, asserting otherwise—specifically that her desk could not be fixed and that Grimes recommended her relocation to the workstation in Room 4603-S—the Administrative Judge found that the Department had established by a preponderance of the evidence that Plaintiff disseminated "untruthful information" in those two emails and therefore sustained the charge that she had engaged in conduct unbecoming a government employee. *Id.* at 28. That evidence—including the testimony from Grimes that the Administrative Judge observed and found credible and the testimony from Plaintiff that she found not credible—is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 587 U.S. 97, 103 (quoting *Consol. Edison*, 305 U.S. at 229).

Plaintiff does not argue the contrary. Instead, she asserts that "Grimes' testimony is disputed and in fact disproven" by evidence such as (1) an affidavit she submitted in connection with her opposition to the Motion for Summary Judgment, allegedly stating that her desk in Room 3846 was not fixed until after she was removed from her position and repeating her allegations about Grimes' statements about the keyboard tray and Plaintiff's relocation, ECF No. 46 at 7–8 (citing ECF No. 46-1); (2) the cross-examination of Grimes at the MSPB hearing, *id.* at 8 (citing Exhs. to Opposition to Motion for Summary Judgment at 532–34, *Robb I*, 2025 WL 1025084 (No. 20-cv-929)); (3) emails cited by the Administrative Judge in her decision, *id.* (citing ECF No. 1-5 at 60–62); (4) the March 2019 ergonomics report, *id.* at 9 (referring to Exs. to Opposition to Motion for Summary Judgment at 631, *Robb I*, 2025 WL 1025084 (No. 20-cv-929))[34]; and (5) Caldera's testimony that Plaintiff was put on telework because of Plaintiff's complaints about her workstation, *id.* (citing Exs. to Opposition to Motion for Summary Judgment at 379, *Robb I*, 2025 WL 1025084 (No. 20-cv-929)).

As to the affidavit, it is generally inappropriate for a court reviewing a decision by the MSPB to consider evidence that was not before the Board. *See, e.g.*, *Cruz v. Dep't of the Navy*, 934 F.2d 1240, 1245 n.6 (Fed. Cir. 1991) (refusing to consider evidence that was not before the Board). In any event, the affidavit does not include the assertions Plaintiff says it does. *See* ECF No. 46-1 at 5–6. More generally, however, Plaintiff's arguments are clearly inviting the Court to re-weigh the evidence before the MSPB and to overturn the credibility determinations made by the Administrative Judge. That is not within the Court's remit on an appeal of a decision of the Board. *See Robinson*, 775 F. Supp. 2d at 157 ("Where an administrative judge's findings are

---

[34] Although the March 2019 ergonomics report is not cited in the Administrative Judge's decision, it was discussed at the hearing. *See, e.g.*, ECF No. 46-4 at 3; Ex. T to Mot. for Summary J. 10–11, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-22.

predicated on credibility assessments, such findings 'are "virtually unreviewable[]" and a plaintiff's *de facto* request for the Court to "re-weigh conflicting evidence" is inconsistent with the reviewing court's function.'" (alteration in original) (quoting *Rountree*, 382 F. Supp. 2d at 32). Accordingly, the undersigned recommends affirming the Board's decision sustaining Charge 2.

### 3.    Rejection of Plaintiff's Whistleblower Retaliation Claim

"To prevail on the merits [of a claim under the Whistleblower Protection Act], an employee must establish, by a preponderance of the evidence, that a protected disclosure was a contributing factor in an adverse personnel action."[35] *Johnston v. Merit Sys. Protection Bd.*, 518 F.3d 905, 909 (Fed. Cir. 2008). A "protected disclosure" includes a disclosure by an employee that she "reasonably believes evidences . . . a violation of any law, rule, or regulation." *Drake v. Agency for Int'l Dev.*, 543 F.3d 1377, 1380 (Fed. Cir. 2008) (quoting 5 U.S.C. § 2302(b)(8)(A)(i)). If the employee makes that showing, the burden shifts to the employer to establish, "by clear and convincing evidence, that it would have taken adverse personnel actions against [the employee] even absent any protected disclosures." *Johnston*, 518 F.3d at 911. "In determining whether the agency has met [its] burden, [courts] consider the three . . . factors" from *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999):

> 1) the strength of the agency's evidence in support of its action, 2) the existence and strength of any motive to retaliate on the part of the agency officials who participated in the decision, and 3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

---

[35] This is a significantly more demanding standard than that applied to establish the jurisdiction of the Board, which requires only "nonfrivolous allegations that the [employee] made a protected disclosure that was a contributing factor to the personnel action taken or proposed." *Johnston v. Merit Syst. Prot. Bd.*, 518 F.3d 905, 909 (Fed. Cir. 2008) (alteration in original) (quoting *Stoyanov v. Dep't of the Navy*, 474 F.3d 1377, 1382 (Fed. Cir. 2007). To meet that standard, an employee must merely make non-frivolous allegations that she made disclosures protected under the statute and "she suffered reprisal in the wake of these disclosures." *Id.*

*McIntosh v. Dep't of Def.*, 53 F.4th 630, 645 (Fed. Cir. 2022).  "The agency 'need not produce evidence with regard to each of these factors, nor must each factor weigh in favor of the agency,' but [courts] instead consider the record as a whole and balance the factors to determine whether substantial evidence supports the agency's action."  *Id.* (quoting *Robinson v. Dep't of Veterans Affs.*, 923 F.3d 1004, 1019–20 (Fed. Cir. 2019)); *see also Marcato v. U.S. Agency for Int'l Dev.*, 11 F.4th 781, 786 (D.C. Cir. 2021) ("We review for substantial evidence the administrative judge's determination that [the employer] met its clear-and-convincing burden.").

The Administrative Judge found that Plaintiff's allegations of mail tampering, which were made "between January and May of 2018 and again in October 2018" were protected disclosures because they "could constitute a violation of law."  ECF No. 41-3 at 45.  However, she found that there was no evidence to establish that the disclosures were a contributing factor to Caldera's proposal to remove Plaintiff or Anderson's decision to remove her.  *See id.* at 45–46.  As support, the Administrative Judge noted that there was no evidence that Plaintiff accused Caldera or Anderson "of taking her mail [or] . . . that they were investigated or disciplined for that action."  *Id.* at 45.  She also found no evidence that any allegation that Plaintiff made against Caldera was a contributing factor in Caldera's proposal to remove Plaintiff from federal service.  *See id.*  Additionally, the Administrative Judge noted that although Anderson was aware of the mail tampering allegations, there was no evidence that Anderson was "involved in those allegations or that she was suspected or accused of any misconduct" and, more, Anderson testified that they had no impact on her decision to remove Plaintiff.  *Id.*  Plaintiff also alleged that she reported suspected mail tampering to the Office of the Inspector General Ombudsman and the ethics office for Trade and Foreign Agricultural Affairs on March 2, 2019, but the Administrative Judge found there was no

documentary evidence or testimony to support that allegation in the record and no evidence that Caldera or Anderson was aware of that alleged disclosure. *See id.* at 45–46.

The Administrative Judge found similarly as to most of the remaining alleged protected disclosures. On February 25, 2019 (the day Plaintiff's five-day suspension was imposed, *see Robb I*, 2025 WL 1025084, at *6), Plaintiff asserted to various management officials that the proposal that she be suspended for five days, issued on November 26, 2018, violated a provision of the collective bargaining agreement stating that "[t]he [a]gency will issue a final decision after receipt of the written and/or oral reply, or the termination of the fourteen (14) calendar day notice period," which she contended meant that that the agency had fourteen days to make a decision on proposed discipline. ECF No. 41-3 at 46 (alterations in original) (quoting the record). The Administrative Judge found that Plaintiff "clearly misread" the agreement, which requires "that the final decision must be made at some time after receipt of the employee's response or after the 14 day time period for responding has passed." *Id.* Because of "the inaccuracy of [Plaintiff's] interpretation" of the provision, the Administrative Judge found that disclosure of Plaintiff's complaint would not have motivated Caldera or Anderson to remove her from federal service. *Id.* at 46–47. Therefore, it was not evidence of whistleblower retaliation.

As to the allegation of alcohol on the premises, the Administrative Judge noted that Cash, the Director of the division that oversees personnel misconduct investigations, testified at the hearing that "it is not illegal to have alcohol in the building and that there is no policy against it"; indeed, there is a departmental regulation that allows parties to apply to serve alcohol in Department facilities and that such permits were granted for celebrations during the 2018 holiday season. *Id.* at 47. Because at the time those permits did not set a time by which the alcohol needed to be removed, the alcohol Plaintiff saw—which she reported on February 27, 2019—might have been

left from those holiday celebrations. *See id.* at 12, 47–48. More, the witness Plaintiff offered to corroborate her assertion that Caldera routinely brought alcohol into the building said she had no knowledge of Caldera ever doing so. *See id.* at 48. There was no action taken against Caldera because Plaintiff's allegations were determined to be unfounded. *See id.* However, the Administrative Judge suggested that the timing of Plaintiff's disclosure—which occurred less than one hour after Caldera emailed Plaintiff the February 27, 2019, Letter of Instruction—suggested that Plaintiff might have been retaliating against Caldera. *See id.* In sum, there was no evidence that the disclosure at issue was a contributing factor in Caldera's decision to propose Plaintiff's removal. *See id.* Similarly, there was no evidence that Anderson was involved in the allegations that alcohol was improperly on the premises or that she was suspected or accused of any misconduct. *See id.* at 49. Further, she testified that the allegations had no impact on her decision. *See id.*

The Administrative Judge found that Plaintiff's conclusory assertion to Caldera that Plaintiff's performance standards "violate[d] MSPB case law" did "not appear to be a protected disclosure" and that there was no evidence it motivated Caldera to propose her removal; nor was there evidence that Anderson was even aware of the dispute regarding Plaintiff's performance standards. *Id.* Similarly, there was no evidence that either Caldera or Anderson was aware that Plaintiff filed a complaint with the Office of Special Counsel on June 5, 2019. *See id.* at 49–50.

Accordingly, the Administrative Judge found that Plaintiff "failed to establish that any of her protected activity . . . was a contributing factor in the agency's proposal or decision to remove her." *Id.* at 50. She also found that the evidence before her would satisfy the Department's burden to show clearly and convincingly that it would have terminated Plaintiff for her "serious and . . . repeated" misconduct in the absence of any protected disclosures. *Id.*

Defendant focuses on the Administrative Judge's finding that "the Department would have issued the proposal to remove and the decision to remove despite any of Plaintiff's alleged protected activity," arguing that the strength of the evidence of Plaintiff's wrongdoing provided sufficient support for that finding.  ECF No. 41-1 at 25–27.  Plaintiff, for her part, fails to respond to that argument, which focuses on the Board's determination that *removal of Plaintiff from federal service* (via the March 18, 2020, Notice of Proposed Removal and the June 2, 2020, Notice of Decision) was not retaliation for protected whistleblowing.  Rather, she focuses exclusively on the Board's decision in the W-2 Whistleblower Case, which did not address that removal.  She notes that, in that case, the Administrative Judge found (1) the Board had jurisdiction with respect to the mail tampering allegation and the allegation about alcohol on the premises, ECF No. 46 at 11 (citing the decision in the W-2 Whistleblower Case, ECF No. 41-4 at 11–13); (2) Plaintiff had established by a preponderance of the evidence that her protected disclosures were a contributing factor in "the proposal to suspend for five days, the decision to suspend for five days, a 14-day suspension that was withdrawn[,] and the proposal to remove from federal service" issued on November 4, 2019, and rescinded, *id.* (citing the decision in the W-2 Whistleblower Case, ECF No. 41-4 at 14);[36] and (3) the Department had established by clear and convincing evidence that it would have taken those same actions in the absence of any protected disclosures, *see id.*  She then argues (1) that "the five day suspension was totally unjustified," noting that "retaliation" is the "only explanation" for the fact that Caldera included in it a charge for failing to attend a meeting after having been "told not to propose" such a charge, and (2) that the Department failed to prove by clear and convincing evidence "the legitimacy of the charges" underlying the rescinded

---

[36] The proposed removal Plaintiff refers to is the November 4, 2019, proposal that was rescinded rather than the March 18, 2020, proposal that was enforced because the decision in the W-2 Whistleblower case deals only with the earlier proposal, *see* ECF No. 41-4 at 30, and because Plaintiff mentions the "whistleblower disclosure involving the alcohol," ECF No. 46 at 13, which was not included in the later Notice of Proposed Removal.

fourteen-day proposed suspension and the rescinded proposed removal. *Id.* at 12–13. Nowhere does she address the Board's determination that her *removal from federal service* was not retaliation for protected whistleblowing. The Court should therefore deem Plaintiff to have conceded Defendant's argument on this point. *See Robb I*, 2025 WL 1025084, at *2; *see also Ray v. Dep't of Def.*, 180 F. App'x 939, 941 (Fed. Cir. 2006) (asserting that the court "must affirm" the MSPB's decision sustaining the removal of the plaintiff from federal service where he did not "address[] the actual basis for the Board's denial of his whistleblower claim, *viz,*, that [he] failed to prove that his protected disclosure was a contributing factor in his removal").

In the alternative, the Court should find, using the *Carr* factors, that the Board's decision is supported by substantial evidence. As noted, courts look at (1) the strength of the evidence supporting the agency's action, (2) the existence and strength of any motive to retaliate on the part of the officials who were involved in the action, and (3) any evidence that the agency takes similar actions against similarly situated employees who are not whistleblowers but who are otherwise similarly situated. *McIntosh*, 53 F.4th at 645. Where the court has "concluded that substantial evidence supports the administrative judge's determination" on the charges supporting the employment action, "the first *Carr* factor strongly supports" the challenged action. *Id.*; *see also Marcato*, 11 F.4th at 788 ("Once the agency presented its evidence in support of its charges of independent causation for the removal, [an employee must] rebut the agency's evidence or risk a finding that the agency had successfully established its affirmative defense . . ." (alterations in original) (quoting *Kewley v. HHS*, 153 F.3d 1357, 1364–65 (Fed. Cir. 1988))). Indeed, courts may find that strong evidence supporting the agency's action "outweigh[s] any role of the second and third *Carr* factors." *Baker v. Soc. Sec. Admin.*, No. 2024-1478, 2024 WL 4490303, at *5 (Fed. Cir. Oct. 15,

2024).  As discussed earlier in this section, the Board's decision sustaining each of the specifications in the two charges at issue was well supported.

As to the second *Carr* factor, the Administrative Judge found no evidence that either Caldera or Anderson was disciplined for being involved in mail tampering or the allegations about alcohol on the premises and that Plaintiff's complaint that her performance standards violated the collective bargaining agreement was erroneous.  *See* ECF No. 41-3 at 45–49.  The Federal Circuit has found that "the strength of any . . . motive [to retaliate is] limited" where "no evidence show[s] that the supervisors faced adverse consequences of being disciplined due to [the] allegations." *Baker*, 2024 WL 4490303, at *5; *see also Knowles v. Dep't of Veterans Affs.*, 796 F. App'x 1026, 1032 (Fed. Cir. 2020) (similar).  Additionally, where there is no evidence in the record that the officials involved in the challenged decision were aware of the protected disclosures—as is the case here with regard to Plaintiff's June 5, 2019, complaint to the Office of Special Counsel *vis-à-vis* both Caldera and Anderson and to Plaintiff's complaint that the performance standards "violate[d] MSPB case law" *vis-à-vis* Anderson, ECF No. 41-3 at 49–50—the second *Carr* factor favors the government.  *See Knowles*, 796 F. App'x at 1030.  And the Administrative Judge found that the latter disclosure was not protected, a conclusion Plaintiff does not challenge.  The third *Carr* factor is "effectively removed from the analysis" because "no pertinent evidence was presented on [it]."[37]  *McIntosh*, 53 F.4th at 646.  "[C]onsider[ing] the record as a whole and balance[ing] the factors," the undersigned finds that "substantial evidence supports the agency's action."  *Id.*; *see also id.* (concluding that substantial evidence supported the administrative judge's

---

[37] In her analysis of the penalty imposed on Plaintiff, the Administrative Judge noted that Plaintiff had offered a potential comparator who "had a conduct unbecoming charge" and was treated more favorably than Plaintiff by being "subjected only to a 14 day suspension."  ECF No. 41-3 at 53.  However, the Administrative Judge did not appear to rely on that fact in her determination that the evidence showed that the Department would have fired Plaintiff even in the absence of protected activity and Plaintiff fails to mention it in her brief, so the undersigned does not consider it here.

determination that the agency had met its burden to show by clear and convincing evidence that the plaintiff would have been removed even absent her grievances where the first factor weight in favor of the government and the second and third factors were neutral).

4.    Penalty

"The determination of an appropriate employment penalty is a matter committed primarily to the discretion of the employer . . ." *Wilson v. Dep't of the Army*, 625 Fed. App'x 543, 546 (Fed. Cir. 2015). The Board reviews a penalty imposed by an agency "only . . . to determine if the agency considered all relevant factors [set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 307–08 (1981)] and exercised managerial judgment 'within tolerable limits of reasonableness.'" *Newsome v. Dep't of Treasury*, 338 F. App'x 902, 906 (Fed. Cir. 2009) (quoting *Douglas*, 5 M.S.P.R. at 302). In turn, a court will "defer to the Board's penalty determination 'unless the penalty exceeds the range of permissible punishments specified by statute or regulation, or . . . the penalty is 'so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion.'" *McIntosh*, 53 F.4th at 638 (quoting *Villela v. Dep't of the Air Force*, 727 F.2d 1574, 1576 (Fed. Cir. 1984)).

There are twelve *Douglas* factors:

(1)    [t]he nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2)    the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3)    the employee's past disciplinary record;

(4)    the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5)    the effect of the offense upon the employee's ability to perform at a satis-
factory level and its effect upon supervisors' confidence in the employee's
ability to perform assigned duties;

(6)    consistency of the penalty with those imposed upon other employees for the
same or similar offenses;

(7)    consistency of the penalty with any applicable agency table of penalties;

(8)    the notoriety of the offense or its impact upon the reputation of the agency;

(9)    the clarity with which the employee was on notice of any rules that were
violated in committing the offense, or had been warned about the conduct
in question;

(10)    potential for the employee's rehabilitation;

(11)    mitigating circumstances surrounding the offense such as unusual job ten-
sions, personality problems, mental impairment, harassment, or bad faith,
malice or provocation on the part of others involved in the matter; and

(12)    the adequacy and effectiveness of alternative sanctions to deter such con-
duct in the future by the employee or others

*Douglas*, 5 M.S.P.R. at 305–06.  Not every factor will be pertinent in every case.  *Weston v. U.S.*

*Dep't of Hous. & Urban Dev.*, 742 F.2d 943, 950 (Fed. Cir. 1983).  A review of Anderson's deci-

sion shows that she reviewed the bulk of the *Douglas* factors.  Specifically, she found that (1)

Plaintiff's "misconduct was repeated and intentional" and "created a disruption to the workplace"

(*Douglas* factor 1); (2) although Plaintiff was not in a supervisory position, her job required "pro-

fessionalism and the ability to follow supervisory directions" and she should be an exemplar of

professional conduct for other employees (*Douglas* factor 2); (3) Plaintiff was disciplined for an

earlier charge of failure to follow instructions, reprimanded for disrespectful conduct in the work-

place, and issued a letter of instruction that also directed her to follow supervisory instructions and

her "repeated failure to follow instructions and instances of conduct unbecoming has negatively

impacted the Agency's confidence in [her] ability" to be professional, satisfactorily perform her

duties, and follow supervisory direction (*Douglas* factors 3 and 5); (4) Plaintiff had been with the Department since November 2013 and was rated "Fully Successful" in her most recent appraisal (*Douglas* factor 4); (5) the penalty of removal was in line with similar offenses as evidenced by the Department's Penalty Guide, which provides for the sanction of removal for disgraceful conduct and sanctions up to and including removal for multiple offenses of failure to follow instructions (*Douglas* factor 7); (6) Plaintiff's repeated misconduct "significantly distinguished [her] actions from any similarly imposed discipline" (*Douglas* factor 6); (7) Plaintiff was on notice that misconduct could result in removal through "repeated attempts to correct similar misconduct in previous instances" (*Douglas* factor 9); (8) there were no mitigating circumstances surrounding the misconduct (*Douglas* factor 11); (9) Plaintiff's repeated misconduct and lack of remorse indicated that rehabilitation was unlikely (*Douglas* factor 10); and (10) sanctions other than removal would not be effective in deterring Plaintiff or others from similar misconduct in the future (*Douglas* factor 12). Ex. U to Mot. for Summary J. 3–5, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 56-23. Anderson concluded that Plaintiff's conduct "undermine[d] the Agency's mission," adversely impacted its "ability to meet its overall goals," and "hinder[ed] the efficiency of the service"; accordingly, "the proposed removal [was] warranted." *Id.* at 5–6.

The Administrative Judge reviewed Anderson's Notice of Decision and took testimony from her to determine whether "the agency conscientiously considered all relevant factors and exercised management discretion within the tolerable limits of reasonableness." ECF No. 41-3 at 51–55. She noted that the Board has held that "inappropriate conduct is disruptive to the workplace and undermines the efficiency of the service," that "an agency has a right to expect its employees to be honest, trustworthy, and candid and that an employee's lack of candor strikes at the very heart of the employer-employee relationship," and that "an agency is entitled to expect its

employees to conform to certain accepted standards of civil behavior and decorum and to respect the authority of supervisors as well as rules and regulations." *Id.* at 55. She cited, among other cases, *Murray v. Department of the Army*, in which the Board found that removal for "creat[ing] a disturbance in the workplace through rude remarks and impolite acts" was a reasonable penalty for an employee with eleven years of federal service, a fully successful performance rating, and prior discipline for similar conduct, 40 M.S.P.R. 250, 255, 257 (1989); *Jackson v. Dep't of the Army*, in which the Board found that removal for, among other things, the "serious offense" of lack of candor, was appropriate for two employees with positive performance appraisals and "years of service," 99 M.S.P.R. 604, 607–08 (2005); and *Redfearn v. Dep't of Labor*, in which the Board found that removal was an appropriate penalty for an employee who repeatedly failed to follow instructions, failed to "conform to . . . accepted standards of civil behavior and decorum," had a "prior disciplinary record that was both progressive in nature and based on [similar] misconduct," and had shown "no remorse of purpose of amendment," 58 M.S.P.R. 307, 316–17 (1993)). The Administrative Judge ultimately found "that the agency-imposed penalty [of removal] supports the efficiency of the service and was reasonable." ECF No. 41-3 at 55.

The only argument Plaintiff makes regarding her penalty is that her discipline "was progressive in nature and relied in part on the five day suspension" and "without that building block . . . [Plaintiff] would not have been terminated." ECF No. 46 at 5. Here she again points to her arguments in opposition to the Motion for Summary Judgment in *Robb I. Id.* ("The Plaintiff herein relies on the arguments made in Robb Case 1, Dkt. 59, pages 13–15 and the exhibits cited thereto."). Those pages argue that there is a genuine issue of material fact as to whether the five-day suspension was based on retaliation. Opp. to Mot. for Summary J. 13–15, *Robb I*, 2025 WL 1025084 (No. 20-cv-929), ECF No. 59. But the undersigned has already rejected that contention,

78

finding that the suspension—which was based on a specification of failure to follow instructions—was not retaliatory.  *See Robb I*, 2025 WL 1025084, at *17.

The penalty of removal neither "exceed[ed] the range of permissible punishments" under the Department's Guide for Disciplinary Penalties nor was "so harsh and unconscionably disproportionate to the offense that it amount[ed] to an abuse of discretion."  *McIntosh*, 53 F.4th at 638 (quoting *Villela*, 727 F.2d at 1576).  The Guide to Disciplinary Penalties provides that the appropriate sanction for a second or subsequent offense of failure to follow instructions, whether negligent or deliberate, includes removal.  *See* ECF No. 1-5 at 115.  Here, Plaintiff was disciplined for failure to follow instructions in February 2019.  *See Robb I*, 2025 WL 1025084, at *6.  The six specifications in Charge 1—which the undersigned has found were supported by substantial evidence, *see* Section IV.C.1, *supra*—constituted a subsequent offense.  And so, removal would have been an appropriate potential remedy even if Charge 2 were not supported by substantial evidence (which it is, *see* Section IV.C.2, *supra*).[38]

As to the reasonableness of the penalty, courts have found that "the failure to follow instructions is undoubtedly a serious matter when it occurs repeatedly over a prolonged period."  *Valles v. Dep't of State*, 17 F.4th 149, 153–54 (Fed. Cir. 2021) (affirming the penalty of removal for an employee whose incidents of failure to follow directions spanned from July 2018 to February 2019).  And the MSPB "has long recognized that removal for falsification and dishonest activity promotes the efficiency of the service since such behavior raises serious doubts regarding the [employee's] reliability, trustworthiness, and continued fitness for employment" and that "removal for failure to follow instructions is not an unreasonable penalty" even when the employee

---

[38] The Guide to Disciplinary Penalties "does not cover every possible offense" and does not include penalties for the specific charge of conduct unbecoming a federal employee.  ECF No. 1-5 at 111.  It does, however, approve the sanction of removal for the first offense of "[i]nfamous or notoriously disgraceful conduct" or "falsification . . . of material facts . . . in connection with an official matter."  *Id.* at 113.

has a history of superior performance. *Erb v. Dep't of the Treasury*, No. 2021-1756, 2024 WL 1110340, at *3 (Fed. Cir. Jan. 24, 2024). Here, Plaintiff's history of failure to follow instructions begins in November 2018 (in an incident for which she was disciplined) and extends to November 2019. *See Robb I*, 2025 WL 1025084, at *6 (noting that Caldera proposed a five-day suspension in November 2018 for failure to follow instructions); ECF No. 41-3 at 11–21 (describing the emails Plaintiff sent between April and November 2019 in contravention of Caldera's instructions). She was also found to have made unfounded representations in two March 11, 2019, emails. *See* ECF No. 41-3 at 23–28. Accordingly, the court should find that imposing the penalty of removal was not an abuse of discretion under the circumstances.

## V.     RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** (1) that Count II and the portion of Count III based on the Rehabilitation Act be **DISMISSED** for lack of subject-matter jurisdiction; (2) that in response to this Report and Recommendation the parties make any arguments regarding whether Count VI should be transferred to an appropriate Court of Appeals pursuant to 28 U.S.C. § 1631 rather than dismissed for lack of subject-matter jurisdiction; and (3) that Defendant's Motion for Summary Judgment, ECF No. 41, be **GRANTED** on the remainder of the claims.

*     *     *     *     *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portions of the Report and Recommendation to which the objections are made. The parties are further advised that failure to file timely objection to the findings and recommendations

set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:  June 4, 2025

                                                            _____
G. MICHAEL HARVEY
United States Magistrate Judge